## THOMSON *v.* PACIFIC RAILROAD.

1. Although, confessedly, Congress may constitutionally make or authorize contracts with individuals or corporations for services to the government; may grant aids by money or land in preparation for and in the performance of such services; may make any stipulation and conditions in relation to such aids not contrary to the Constitution, and may exempt, in its discretion, the agencies employed in such services from any State taxation which will really prevent or impede the performance of them; yet in the absence of all legislation on the part of Congress to indicate that such an exemption is deemed by it essential to the full performance of the party's obligations to the government, the exemption cannot be applied to the case of a corporation deriving its existence from State law, exercising its franchise under such law, and holding its property within State jurisdiction and under State protection, only because of the employment of the corporation in the service of the government.

2. The point decided in *McCulloch* v. *Maryland* does not establish a broader doctrine even if some of its reasoning may seem to do so.

ON certificate of division in opinion between the judges of the Circuit Court for the District of Kansas. The case was this:

The Union Pacific Railway Company, Eastern Division, was originally incorporated in 1855, by the legislature of the Territory of Kansas, as the Leavenworth, Pawnee, and Western Railroad Company, with authority to construct the road from the west bank of the Missouri to the western boundary of the Territory. Subsequently, in 1862, under an act of the State of Kansas, it assumed its present name, with authority to unite or consolidate with any other com

pany or companies organized, or to be organized, under the laws of the United States, or of any State or Territory.

Some months later, the Union Pacific Railroad Company was incorporated by Congress, with power (conferred by the original act of 1862 and various amendatory acts) to construct a railroad and telegraph westward through the territory of the United States, from the hundredth meridian east of Greenwich, to connect with the Central Pacific Railway Company, incorporated by the State of California, and so to form, in connection with eastern roads, a continuous line from ocean to ocean. Several other railroad companies, already incorporated by Missouri and Iowa, as well as the company just mentioned, chartered by Kansas, were authorized to construct roads through the National territory, so as to join the Union Pacific road on the hundredth meridian; and to all these roads large grants of land were made, and large subsidies engaged on the security of a second mortgage, upon the condition of paying, at maturity, the bonds advanced by way of subsidy, and of rendering certain services to the government in the transmission of messages, and in the transportation of mails, troops, munitions, and other property, at reasonable rates of compensation.

But neither by the original act, nor by any amendment, did Congress undertake to incorporate any railroad company, or authorize the construction of any railroad within the limits of any State, without the consent of the State concerned. And this was as true of the Union Pacific Railway Company, Eastern Division, as of any other of the roads aided by Congress. Whatever was done by Congress in reference to this last-named road, was done not merely with the consent, but upon the solicitation of the State of Kansas. The corporation, however, remained a State corporation, though entitled to certain benefits, and subject to certain duties under the legislation of Congress.

In this state of things, and the legislature of Kansas having passed a law laying certain taxes upon the property of the company, one Thomson and numerous other persons filed a bill in the Circuit Court of the United States for the

District of Kansas, against the Union Pacific Railway Company, Eastern Division, and three persons, whom the bill named, treasurers, respectively, of Douglass, Wyandotte, and Jefferson counties, in the State of Kansas. The bill stated that the complainants were stockholders in the railway company; that under an act of the legislature of Kansas certain taxes had been imposed on the railroad and telegraph property of the company, which the treasurers of the counties named were proceeding to collect; that the property of the company was mortgaged to the United States; that the company was bound to perform certain duties, and ultimately to pay five per cent. of its net earnings to the United States; that the company would be greatly hindered and embarrassed in the performance of its obligations and duties to the United States, if the taxes imposed should be collected; and that, to some extent, taxes of the same description had been already paid by the company, to the prejudice of the just rights of the complainants and of the securities of the United States. Upon this case the complainants prayed an injunction to restrain the company from paying, and the other defendants from collecting, the taxes assessed; and a temporary injunction was allowed by the district judge.

The answer of the company admitted the allegations of the bill. The answers of the three county treasurers admitted the assessment of the taxes under the laws of Kansas, but denied that such taxes had been imposed with any view to impede or embarrass the railway company, and insisted that the property of the company only bore its due proportion of the taxes levied upon all property in the State of Kansas, and that no discrimination was made against the company in the matter of taxation.

To these answers no replication was put in; but an agreed statement of facts was filed, which recited sundry resolutions of the Kansas legislature, urging upon Congress legislation in aid of the railway company; and admitted that the property of the company was liable, under the laws of Kansas, to be taxed for State, county, and municipal purposes; that the taxes complained of had been assessed in conformity

with the statutes of the State; that the company had exe-
cuted a first mortgage prior in lien to the debt to the United
States, and that a table of earnings and expenditures for
1867–8, appended to the agreed statement, was correct.

Upon these pleadings and this agreed statement the ques-
tion arose, whether the property of the railway company de-
scribed in the bill was subject to the tax which the statutes
of Kansas authorized to be levied on all other property, not
specially exempted, for State, county, and municipal pur-
poses. And upon this question the judges of the Circuit
Court were divided in opinion, and certified it for decision
here.

*Mr. Hoar, Attorney-General, and Mr. Usher, for the com-
plainant:*

The question is of the gravest importance, not so much to
the complainants, in this case, as to the railroad companies
organized and deriving their powers under the acts of Con-
gress providing for the construction of the Union Pacific
Railroad and its branches, and the States, Territories, and
municipalities through which those roads pass, and that shall
hereafter be formed or created along their course.

These roads have their eastern termini one hundred and
fifty miles east of the geographical centre of the United
States, and every part of them will be subject to local laws,
and the capriciousness of those who shall make and execute
those laws, unless, by the law of their being they are ex-
empt from such control.

This property is exempt for two reasons:

1st. A minor one. Because by the sixteenth section of the
charter of the company the State has the right to purchase
the road at the end of fifty years. The section is as follows:

   "Said company shall keep a fair record of the whole expense
of constructing said road, and at the end of fifty years the State
or States through which the said road shall pass shall be at liberty
to purchase said road by paying to said company the amount at
which it shall be valued by persons to be mutually chosen by
the State and by said company."

The State has, therefore, an interest in the road—a special property—and by its fundamental law cannot tax it.*

2d. A greater reason. The history of this road is matter of public knowledge. It is one and a part of a system of roads constructed under the direction and authority of Congress for the use and purposes of the United States, in the exercise of its powers to "provide for the common defence and general welfare of the United States, to regulate commerce among the several States, to establish post-offices and post-roads, to raise and support armies, and to suppress insurrections and invasions."

For many years the necessity of a Pacific railroad was pressed upon Congress through conventions and petitions; but upon the breaking out of war its necessity to the government as a means for the preservation of its authority over all its territory upon the Pacific coast became so apparent, that provision was made for building the road, at a time when the expenditures of the government were more than a million of dollars per day for carrying on the war. When, two years afterward, it was found that the work had languished because of the inadequacy of government assistance, additional aid was given by Congress to secure the speedy construction of the work; and this, though the nation was then daily expending larger sums in carrying on the war, and though its debt had increased by hundreds of millions. It is a military, postal, and commercial road, and came out of the throes of the rebellion. It was designed to promote the unity and indivisibility of our people. It was to stretch forth the hands of the Great Valley until they clasped in peace and unity the hands of Oregon and California, to bind and cement in indissoluble bonds a dissolving Union; to carry the mails "safely" and "speedily" to the people inhabiting half of the National domain; to transmit telegraphic despatches to all these people with the rapidity of thought; to send troops and munitions of war to protect the defenceless men, women, and children of the frontier.

---

* Inhabitants v. Railroad, 4 Metcalf; 564.

against Indian barbarities; to enable the landless to have homes of their own; to develop and convert to the National uses the stores of gold and silver, and other valuable minerals imbedded in the mountains, and inaccessible but by these and other roads; to enable the government to suppress insurrections and repel invasions, should any occur, in all the country west of the mountains, and that the people might be brought into easy, cheap, and frequent communication with each other, whereby they should live together in lasting harmony and peace.   Such was its history and well-known design; a work which, more than any other ever undertaken by the government, tends to consolidate peace, and to maintain the dignity, and reflect the glory of the nation.   How in the face of all this history and all this design, can it be held that the action of Congress was a purposeless use of the lands and credit of the United States, for the benefit of divers corporations beyond the control of Congress? and that the United States was to be placed in the relation to them of a simple contract creditor, confined to such remedies as the laws of the numerous States and Territories traversed by the road and its branches afford?

Will it be said that because Congress, in devising the means by which it should execute the powers conferred by the Constitution, has profited of corporations created in part by Congress for the purpose, and in part by other authority, and because the normal condition of these corporations was such as would make them liable to taxation—the fact that Congress has created the one and adopted the others to its use—does not affect the right of the State to tax and subvert all this property, and so put an end to the scheme devised by Congress for the use and preservation of the government?

The answer is plain.   The Congress of the United States, in the exercise of its constitutional power, has adapted this artificial body to its use, has made it its agent, has clothed it with new and additional powers to enable it to execute the lawful will of Congress, and the State cannot in any manner retard, impede, burden, or control the operations of

this agent, the company, in the discharge of its duties and obligations to the Federal government.

If it was necessary, the wisdom of the laws under consideration could be easily vindicated; but it is enough to say that Congress intended to and did provide for the execution of certain of its delegated powers. And this has been done in the mode and way which Congress deemed most appropriate; one in which the greatest economy could be practised, and the greatest benefit secured to the public, with the least expenditure of the public money.

Consider the effect of these Kansas tax laws upon this property. If sold by virtue of them for non-payment of taxes, the purchaser is to have a deed in fee simple of the premises or parcel of land that he purchased, not a deed that constitutes him a corporation, or that establishes any relation between him and the company, or the United States. But how is it possible for the State to invest him with a fee simple title?

And what becomes of the personalty—the "rolling stock," as it is called? That is to be seized by the sheriff and sold; and being personalty, and necessarily in the possession of the sheriff, it shall come to pass that the locomotive and train transporting the mail, troops, and war material of the United States over this road through Kansas, destined for New Mexico, Colorado, or elsewhere beyond to protect the inhabitants or suppress an insurrection, shall be seized by the Kansas sheriff for the non-payment of taxes.

The case of *McCulloch* v. *Maryland** seems to decide this one. This court, there holding that Congress under the Constitution has absolute and exclusive power to determine whether an act of legislation is or is not necessary for carrying into effect one or more of its enumerated powers, proceeds to say that acts passed by it to these ends cannot be controlled by State law. It says further:

"The power to create is the power to preserve. The power to tax is the power to destroy, and a power to destroy, wielded

---

* 4 Wheaton, 316.

by a different hand, is incompatible with a power to create and preserve. . . . . The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its own authority, but it does not extend to *those means which are employed by Congress* to carry into execution powers conferred on that body."

And, again:

"We find on just theory a total failure of the original right to tax *the means employed by the government of the Union for the execution of its plans.* This right never existed, and the question whether it has been surrendered cannot arise. . . . . If the States may tax one instrument employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail, the mint, patent rights, the papers of the custom-house, and all the means employed by the government. This was not intended by the American people."

It was not the intention of Congress to bargain with a corporation in Kansas for the use of their road and telegraph. They did not mean to take a lease for years and enforce their rights therein by action. On the contrary, it was an ordinary act of legislation to secure a political end of government. Congress intended to create an agent and to compel its active employment by means of law and powers reserved in transporting mails, troops, munitions of war, and necessary information.

A brief was also submitted against the right of the States to tax, by *Mr. J. H. Storr, of counsel for the Central Pacific Railroad of California, and of the Western Pacific Railroad Company.*

*Mr. Banks, for the defendants; a brief of Mr. Thatcher being filed.*

The CHIEF JUSTICE delivered the opinion of the court.

In this case the court has no concern with any of the connected roads which form, or are destined to form, links in

the great chain of transcontinental railway.  We have only to consider the liabilities and rights of the Union Pacific Railroad Company in respect to taxation under State legislation.  Argument has been heard on behalf of some of the connected corporations, only because of their interest in the question, by reason of their similar situation and circumstances in reference to like legislation.

The counsel for the complainants have justly said that the question certified here for decision is one of very grave importance.

It was suggested, rather than argued, by one of them, that the property of the State is exempt by the State constitution from taxation; and that the State, having reserved to itself in the charter the right to purchase the road at the end of fifty years at a valuation then to be made, upon two years' notice to the company, has, therefore, a property in the road which cannot be taxed.  But it is too plain for argument that the interest thus reserved is too remote and too contingent to be regarded as within the meaning of the exemption.

The main argument for the complainants, however, is that the road, being constructed under the direction and authority of Congress, for the uses and purposes of the United States, and being a part of a system of roads thus constructed, is therefore exempt from taxation under State authority.  It is to be observed that this exemption is not claimed under any act of Congress.  It is not asserted that any act declaring such exemption has ever received the sanction of the National legislature.  But it is earnestly insisted that the right of exemption arises from the relations of the road to the General Government.  It is urged that the aids granted by Congress to the road were granted in the exercise of its constitutional powers to regulate commerce, to establish post-offices and post-roads, to raise and support armies, and to suppress insurrection and invasion; and that by the legislation which supplied aid, required security, imposed duties, and finally exacted, upon a certain contingency, a percentage of income, the road was adopted as an instrument of the government, and as such was not subject to taxation by the State.

The case of *McCulloch* v. *Maryland* is much relied on in support of this position. But we apprehend that the reasoning of the court in that case will hardly warrant the conclusion which counsel deduce from it in this. In that case the main questions were, Whether the incorporation of the Bank of the United States, with power to establish branches, was an act of legislation within the constitutional powers of Congress, and, whether the bank and its branches, as actually established, were exempt from taxation by State legislation. Both questions were resolved in the affirmative. In deciding the first the court did not hold, as counsel suppose, that Congress, under the Constitution, has absolute and exclusive power to determine whether an act of legislation is or is not necessary and proper as a means for carrying into effect one or more of its enumerated powers. It defined the words "necessary and proper" as equivalent in meaning to the words "appropriate, plainly adapted, not prohibited, but consistent with the letter and spirit of the Constitution," and held that the incorporation of a bank with branches was a necessary and proper means to the effectual exercise of granted power within the definition thus given. It held further that Congress was, within this limit, the exclusive judge as to the means best adapted to the end proposed, and that its choice of any means of the defined character was restricted only by its own discretion. But the question whether the particular means adopted was within the general grant of incidental powers was determined by the court. A great part of the argument was directed to the proposition that the incorporation of a bank was an exercise of incidental power within the true meaning of the terms "necessary and proper," as explained by the court—an argument which would have been quite superfluous if that question was to be determined finally by the legislative and not by the judicial department of the government.

We do not doubt, however, that upon the principles settled by that judgment, Congress may, in the exercise of powers incidental to the express powers mentioned by counsel, make or authorize contracts with individuals or corpora-

tions for services to the government; may grant aids, by money or land, in preparation for, and in the performance of, such services; may make any stipulation and conditions in relation to such aids not contrary to the Constitution; and may exempt, in its discretion, the agencies employed in such services from any State taxation which will really prevent or impede the performance of them.

But can the right of this road to exemption from such taxation be maintained in the absence of any legislation by Congress to that effect?

It is unquestionably true that the court, in determining the second general question, already stated, did hold that the Bank of the United States, with its branches, was exempt from taxation by the State of Maryland, although no express exemption was found in the charter. But it must be remembered that the Bank of the United States was a corporation created by the United States; and, as an agent in the execution of the constitutional powers of the government, was endowed by the act of creation with all its faculties, powers, and functions. It did not owe its existence, or any of its qualities, to State legislation. And its exemption from taxation was put upon this ground. Nor was the exemption itself without important limitations. It was declared not to extend to the real property of the bank within the State; nor to interests held by citizens of the State in the institution.

In like manner other means and operations of the government have been held to be exempt from State taxation: as bonds issued for money borrowed;* certificates of indebtedness issued for money or supplies;† bills of credit issued for circulation.‡ There are other instances in which exemption, to the extent it is established in *McCulloch* v. *Maryland*, might have been held to arise from the simple creation and organization of corporations under acts of Congress, as in the case of the National banking associations; but in which

---

* Weston v. City of Charleston, 2 Peters, **467**.
† The Banks v. The Mayor, 7 Wallace, **24**.
‡ Bank v. Supervisors, Ib. 28.

Congress thought fit to prescribe the extent to which State taxation may be applied.* In all these cases, as in the case of the Bank of the United States, exemption from liability to taxation was maintained upon the same ground. The State tax held to be repugnant to the Constitution was imposed directly upon an operation or an instrument of the government. That such taxes cannot be imposed on the operations of the government, is a proposition which needs no argument to support it. And the same reasoning will apply to instruments of the government, created by itself for public and constitutional ends. But we are not aware of any case in which the real estate, or other property of a corporation not organized under an act of Congress, has been held to be exempt, in the absence of express legislation to that effect, to just contribution, in common with other property, to the general expenditure for the common benefit, because of the employment of the corporation in the service of the government.

It is true that some of the reasoning in the case of *McCulloch* v. *Maryland* seems to favor the broader doctrine. But the decision itself is limited to the case of the bank, as a corporation created by a law of the United States, and responsible, in the use of its franchises, to the government of the United States.

And even in respect to corporations organized under the legislation of Congress, we have already held, at this term, that the implied limitation upon State taxation, derived from the express permission to tax shares in the National banking associations, is to be so construed as not to embarrass the imposition or collection of State taxes to the extent of the permission fairly and liberally interpreted.†

We do not think ourselves warranted, therefore, in extending the exemption established by the case of *McCulloch* v. *Maryland* beyond its terms. We cannot apply it to the

---

\* Van Allen *v.* The Assessors, 3 Id. 573; Bradley *v.* The People, 4 Id. 459; People *v.* Commissioners, Ib. 244.

† National Bank *v.* Commonwealth, *supra*, 353; Lionberger *v.* Rowse. *supra*, 468.

case of a corporation deriving its existence from State law, exercising its franchise under State law, and holding its property within State jurisdiction and under State protection.

We do not doubt the propriety or the necessity, under the Constitution, of maintaining the supremacy of the General Government within its constitutional sphere. We fully recognize the soundness of the doctrine, that no State has a " right to tax the means employed by the government of the Union for the execution of its powers." But we think there is a clear distinction between the means employed by the government and the property of agents employed by the government. Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means.

No one questions that the power to tax all property, business, and persons, within their respective limits, is original in the States and has never been surrendered. It cannot be so used, indeed, as to defeat or hinder the operations of the National government; but it will be safe to conclude, in general, in reference to persons and State corporations employed in government service, that when Congress has not interposed to protect their property from State taxation, such taxation is not obnoxious to that objection.*

We perceive no limits to the principle of exemption which the complainants seek to establish. It would remove from the reach of State taxation all the property of every agent of the government. Every corporation engaged in the transportation of mails, or of government property of any description, by land or water, or in supplying materials for the use of the government, or in performing any service of whatever kind, might claim the benefit of the exemption. The amount of property now held by such corporations, and having relations more or less direct to the National government and its service, is very great. And this amount is continually increasing; so that it may admit of question

---

* Lane County *v.* Oregon, 7 Wallace, 77; National Bank *v.* Commonwealth, *supra,* 353.

whether the whole income of the property which will remain liable to State taxation, if the principle contended for is admitted and applied in its fullest extent, may not ultimately be found inadequate to the support of the State governments.

The nature of the claims to exemption which would be set up, is well illustrated by that which is advanced in behalf of the complainants in the case before us. The very ground of claim is in the bounties of the General Government. The allegation is, that the government has advanced large sums to aid in construction of the road; has contented itself with the security of a second mortgage; has made large grants of land upon no condition of benefit to itself, except that the company will perform certain services for full compensation, independently of those grants; and will admit the government to a very limited and wholly contingent interest in remote net income. And because of these advances and these grants, and this fully compensated employment, it is claimed that this State corporation, owing its being to State law, and indebted for these benefits to the consent and active interposition of the State legislature, has a constitutional right to hold its property exempt from State taxation; and this without any legislation on the part of Congress which indicates that such exemption is deemed essential to the full performance of its obligations to the government.

We are unable to find in the Constitution any warrant for the exemption from State taxation claimed in behalf of the complainants; and must, therefore, answer the question certified to us

IN THE AFFIRMATIVE.