In the Matter of the Application of De La Vergne Machine Company, Petitioner, for a Certiorari Order against the Tax Commission of the State of New York, Respondent.

Third Department, January 7, 1925.

Taxation — tax on corporation under Tax Law, article 9-A, for year beginning November 1, 1919, and ending October 31, 1920, based on net income for year ending December 31, 1918 — stock of corporation was acquired by United States government in 1917 and not sold until January 6, 1920 — corporation was used by government for war purposes — income for period specified not taxable.

A tax cannot be imposed under article 9-A of the Tax Law on a corporation for the year beginning November 1, 1919, and ending October 31, 1920, based on the income of the corporation for the year ending December 31, 1918, where it appears that the United States government acquired all the stock of the corporation in 1917 and used the corporation for war purposes thereafter, and that the stock was not sold by the government until January 6, 1920; the State has no power to tax a United States government enterprise.

Hinman, J., dissents.

Certiorari order granted out of the Supreme Court at the Albany Special Term and entered in the office of the clerk of the county of Albany on the 22d day of October, 1921, directed to the Tax Commission of the State of New York, commanding it to certify and return to the office of the clerk of the county of Albany all and singular its proceedings had in refusing to annul a tax imposed upon relator for the year beginning November 1, 1919, under article 9-A of the Tax Law.

*Graham, McMahon, Buell & Knox* [*Ralph P. Buell* of counsel], for the petitioner.

*Carl Sherman,* Attorney-General [*C. T. Dawes* of counsel], for the respondent.

H. T. Kellogg, J.:

The relator, the De La Vergne Machine Company, a corporation organized under the laws of the State of New York, complains of a tax, assessed against it by the State Tax Commission, under article 9-A of the Tax Law, for the taxable year beginning November 1, 1919, and ending October 31, 1920, based upon its net income for the year ending December 31, 1918.

The relator was a manufacturer of ice-making machines and oil engines. It was the owner of a plant situate upon premises owned by it upon the water front of the East river in the city of New York. The United States, through its Secretary of the Navy, prior to October 9, 1917, had entered into a contract with the William Cramp & Sons Shipping and Engine Building Company, for the construction by it, for the use of the Navy, of twenty-five torpedo boat destroyers. On the date named the Secretary of the Navy designated the Cramp Company as its agent to take over the plant and premises of the relator, for the purpose of using the same in building machinery for the destroyers. On the 26th day of December, 1917, the United States, by its Secretary of the Navy, entered into a formal written contract with the William Cramp & Sons Ship and Engine Building Company. The contract, among other things, recited that the President of the United States had been authorized by an act of Congress to expend, at his discretion, a sum of money for the construction of torpedo boat destroyers; that he had been authorized to make acquisition and to take immediate possession of all lands and improvements necessary to that end; that the President had required the William Cramp & Sons Ship and Engine Building Company to construct twenty-five torpedo boat destroyers; that he had directed the acquisition by it for such purpose of the plant and premises of the De La Vergne Machine Company. It recited further that " The object of the President in ordering that the possession of and title to the said properties of the De La Vergne Machine Company be taken over by and for the United States is to secure and provide for the Navy Department a suitable plant wherein to manufacture, or cause to be manufactured, certain materials needed for use in the construction of the twenty-five torpedo boat destroyers hereinbefore mentioned." The contract required the Cramp Company, acting as the agent of the United States, with moneys to be furnished by the Paymaster-General, to purchase the stock of the De La Vergne Company and transfer the same to the Secretary of the Navy. The Cramp Company was required and agreed to assume the management of the business of said company; to fulfill all commercial contracts then outstanding on the part of such company, provided

their fulfillment did not interfere with the construction of the torpedo boat destroyers; to proceed with the liquidation of the De La Vergne Company as soon as practicable; to account, upon the termination of the De La Vergne Company, to the Secretary of the Navy for all property taken over from that company. It was agreed between the parties that if in the fulfillment of the commercial contracts of the De La Vergne Company the moneys should exceed the cost and expenses incurred upon that account, the Cramp Company might retain such excess as compensation for its services as agent; that if the cost and expenses should exceed the moneys received, then the Cramp Company should be reimbursed by the Secretary of the Navy for the deficiency. The Cramp Company immediately entered upon the performance of its contract duty. It purchased, with moneys furnished by the United States, all the stock of the De La Vergne Company and transferred its shares of stock to the Secretary of the Navy. It caused all the directors of the De La Vergne Company immediately to resign and filled their offices with men selected by it. It entered upon the immediate possession of the premises and plant of the De La Vergne Company and thereafter operated the plant to fill commercial contracts outstanding, and to build the machinery required for the torpedo boat destroyers. It made a financial success of its management of the affairs of the De La Vergne Company. The net income of the De La Vergne Company for the year 1918 was $362,000. What proportion of the net income thus received was attributable to the business of manufacturing machinery for commercial use does not appear. The United States remained the owner of the stock of the De La Vergne Company and operated its affairs through the Cramp Company until the 6th day of January, 1920, when the stock of the company was sold to the Cramp Company for the sum at which it had been purchased. The relator contends that the tax assessed was an illegal imposition upon the property and activities of the United States.

The principle " that the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress, to carry into execution the powers vested in the general government " was long ago established by the case of *McCulloch* v. *State of Maryland* (4 Wheat. [17 U. S.] 316), in which Chief Justice MARSHALL wrote one of his memorable opinions. The same court, in *Thomson* v. *Union Pacific Railroad* (9 Wall. 579), writing through CHASE, Ch. J., restated the principle as follows: " We fully recognize the soundness of the doctrine, that no State has a ' right to tax the means employed by the Government of the Union for the

execution of its powers.'" The court said further: " Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means." The distinction thus noted between taxation of the agency and taxation of the property of the agent was under consideration in the recent case of *Clallam County* v. *United States* (263 U. S. 341). In that case the validity of a tax upon the physical properties of the United States Spruce Production Corporation, a corporation organized under the laws of the State of Washington, was discussed. The corporation had been organized by the Director of Aircraft Production under an act of Congress providing for the manufacture of aircraft and its equipment. The United States subscribed for and controlled the shares of the corporation. The activities of the corporation " were wholly directed to the government's program of production of aeroplane lumber " to construct aeroplanes for war purposes. It was held that the tax was illegally imposed. In commenting upon the distinction made that taxation of the property of the agent is not taxation of the means Mr. Justice Holmes said: " But it may be, and, in our opinion, clearly is, when, as here, not only the agent was created, but all the agent's property was acquired and used, for the sole purpose of producing a weapon for the war. This is not like the case of a corporation having its own purposes as well as those of the United States, and interested in profit on its own account. The incorporation and formal erection of a new personality was only for the convenience of the United States, to carry out its ends."

We can see no difference between the erection of a new corporation by the United States as in the *Clallam County* case, to promote the ends of a war undertaken by it, and the purchase of all the stock of an existing corporation, as in the case at bar, for the furtherance of the identical purpose. It was expressly stated in the contract between the United States and the Cramp Company that the sole object of the President in taking over the properties of the De La Vergne Company was to secure a suitable plant wherein to manufacture " materials needed for use in the construction of the twenty-five torpedo boat destroyers." It did not militate against the attainment of this object that the Cramp Company was required to fulfill all outstanding contracts for commercial machines. On the contrary, it was a requirement made in furtherance of the Federal purpose, for it was necessary that the corporation be freed from its obligations in order that its corporate life might be ended and its properties become devoted exclusively to the manufacture of war machinery.

During the year 1918 the United States was the exclusive

owner of the stock of the corporation and was likewise, through the Cramp Company, the exclusive manager of its affairs. It was the net income received by the corporation during that year which was made the basis of the tax. Therefore, if we regard the tax as being essentially a tax upon net income it was a tax upon income accruing to the United States and consequently invalid as a tax upon Federal property. The same result follows if we regard it as a tax upon the privilege of doing business or exercising a franchise. The taxable status of the De La Vergne Company for the year November 1, 1919, to October 31, 1920, was determinable on November 1, 1919. (*State of N. Y.* v. *Jersawit,* 263 U. S. 493.) In the case cited Mr. Justice HOLMES said: "We are of opinion that the tax is a tax upon the right conferred, not upon the exercise of it." On the date named the United States was still the owner of the stock and was still the manager of the business of the corporation. Moreover, the tax was payable, if at all, on or before January 1, 1920. (Tax Law, § 219c, added by Laws of 1917, chap. 726, as amd. by Laws of 1919, chap. 628.)* On that date the United States was still the owner of the stock. Therefore, the tax, if payable at all, was payable by the United States. It was payable, if at all, for the privilege of exercising the franchise or doing the business of making vessels for the use of the Navy. We think that upon either theory the tax imposed had a manifest tendency to " retard," " impede " and " burden " the activities of the United States in the progress of the war and otherwise to interfere with the execution of power constitutionally committed by Congress to the Federal government.

The determination should be annulled, with fifty dollars costs and disbursements.

All concur, except HINMAN, J., dissenting.

Determination annulled, with fifty dollars costs and disbursements.