SUSQUEHANNA POWER COMPANY *v.* STATE TAX COMMISSION.

[No. 38, April Term, 1930.]

336

*Decided June 12th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Stevenson A. Williams* and *Charles McHenry Howard,* with whom was *Frederick R. Williams* on the brief, for the appellant.

*Thomas H. Robinson,* and *Charles H. MacNabb,* with whom was *Robert H. Archer, Jr.,* on the brief, for the State Tax Commission.

OFFUTT, J., delivered the opinion of the Court.

The Susquehanna River, prior to the construction of the Conowingo dam, flowed in a series of pools and rapids over a rocky bed through a narrow basin or valley from the Mc-Call's Ferry dam in Pennsylvania to Shure's Landing in Maryland, a distance of some fourteen miles. In that distance the fall of the river was about one hundred feet. That fall, the shape of the basin through which the river flows, and the volume of its flow, combined to give to that basin a peculiar value because of its potential utility for the construction of an artificial lake or pool which might be controlled and applied to the manufacture of electric energy.

Many years ago a group of men, who had the vision to see the power latent in that little valley, had also the genius to conceive a plan for converting the possibilities patent to them into living fact, and the resource to carry their plans to a successful fruition. And as a result of their efforts there was substantially completed in 1928 the plant of the Susquehanna Power Company, consisting of a dam at Shure's Landing, a lake or pool containing the waters impounded by that dam, the land covered by its waters and land adjacent thereto, power houses, structures and machinery to convert the water power into electric energy, transmission lines to transmit the energy thus generated to its market, and such other structures, tools, machinery, and equipment as are appropriate or convenient to the production and sale of electric energy by that plant. So much of the plant as has been completed is capable of generating electric energy equivalent to 385,000 horse power, and when four additional units for which foundations have been constructed are added it will, in the opinion of George P. Roux, the company's engineer, be the largest hydro-electric project in the world.

On September 25th, 1928, so much of the project as was to be immediately constructed was nearing completion, and

on that day the County Commissioners of Harford County addressed to the Susquehanna Power Company and Mr. Stevenson A. Williams, its attorney, a notice stating that they had placed on the property of the company in Harford County the following assessment:

"Electrical transmission system......... $109,293.
Land submerged and rights............ 6,622,816.
Buildings (dam and power house)...... 12,003,156.

Total..................... $18,735,265."

and that they would hear objections to that assessment on October 4th, 1928. Following that notice, on the day named, objections were filed by the company and it was heard as to them by the county commissioners. Those objections were in part based upon the contention that the description given by the county commissioners of the property assessed was too "vague, indefinite and general," and in response to that objection the county commissioners in their answer itemized the assessment as follows:

"Electric transmission system in Harford
County, exclusive of Delta line....... $109,293.
Transmission line, Delta Conowingo
Dam:
4.16 Miles wire at $40........$ 166.
117 Poles at $6.25............ 1,043.
2 Towers at $100............ 200.
                                        1,409.
Portion of dam located in Harford
County, and power house........... 12,003,156.
Railroad:
3.16 Miles at $10,000........$31,600.
132.37 Acres of land......... 4,500.
                                        36,100.
Water towers ..................... 4,500.
2 Dwelling houses ................. 19,000.
Islands, 3.58 acres at $50.00.......... 175.
Rocky hillside, 569.81 acres at $20.00... 11,396.
Wooded land, 882.67 acres at $30.00.. 24,460.

| | |
|---|---:|
| Tillable land, 690.77 acres at $50.00.... | 34,538. |
| Buildings........................... | 15,840. |
| Submerged lands, 2,110 acres, and rights therein........................... | 6,620,786. |
| | $18,882,653. |

"The assessment on the submerged lands, amounting to 2,110 acres and rights therein includes all the land that was submerged before and is now submerged by the construction of the dam, and is based on figures submitted by The Susquehanna Power Company."

From that assessment the company appealed to the State Tax Commission of Maryland which, after a hearing, reversed the action of the County Commissioners of Harford County, and assessed the property as follows:

| | |
|---|---:|
| "Transmission system .............:.. | $94,800. |
| Railroad, 3.16 miles at $5,000 per mile. | 15,800. |
| Water towers....................... | 4,500. |
| 2 Dwelling houses ................... | 19,000. |
| 3.58 Acres of islands at $50 per acre.... | 179. |
| 569.81 Rocky hillside at $20 per acre.... | 11,396. |
| 888.67 Acres woodland at $30 per acre.. | 26,460. |
| 690.77 Acres tillable land at $50 per acre. | 34,538. |
| Buildings........................... | 15,840. |
| 2,110 Acres (more or less) submerged land........................... | 2,349,300. |
| Power house and portion of dam located in Harford County ................ | 9,413,350. |
| SECOND DISTRICT. | |
| 114.99 Acres land and buildings........ | 3,650. |
| 3.35 Miles railroad at $5,000 per mile.. | 16,750. |
| SIXTH DISTRICT. | |
| 64.47 Acres of land and buildings, less 48.7 acres of land used by railroad.. | 10,770. |
| Railroad warehouse ................. | 750. |
| 1.31 Miles railroad at $5,000 per mile... | 6,550. |
| Total.................... | $12,023,633." |

340

Thereafter the company filed in the Circuit Court for Harford County a petition in the nature of an appeal from the order of the State Tax Commission, in which, referring to the assessment made by that commission, it alleged that it was illegal and erroneous.

"(a) Because said submerged land, and any rights of your petitioner therein, constitute an essential or integral part of its 'complete unit' and 'project area' or of the pool to be formed by it on the Susquehanna River under the terms of the license from the Federal Power Commission above mentioned, and the same are exempt from assessment and taxation for State and County purposes, because in constructing, maintaining and operating the same under said license your petitioner is acting as an agency or instrumentality of the Federal Government for the promotion of navigation and development of the navigable capacity of the water power of said river, and the taxing by the State of Maryland or by said county of such part of its property will operate to defeat the objects and purposes of said license and the rights reserved to the United States thereunder.

"(b) Because in so valuing and assessing said submerged land, at such excessive rate, the Tax Commission of Maryland arrived at such excessive valuation in an erroneous and illegal way, by including in such valuation the value of your petitioner's franchises (Federal or State) and also by including in such valuation elements of value which belong to your petitioner's property outside of Harford County and outside of the State of Maryland, thereby arriving at an excessive valuation or assessment for the submerged land owned by your petitioner which is now located in and a part of the bed of such pool, formed by the waters in the Susquehanna River.

"(c) Because in so valuing and assessing submerged lands owned by your petitioner, which were at the time of the said assessment and are now a part of the bed of the Susquehanna River, the State Tax Commission of Maryland included in said assessment, to give it such

value, the waters of the Susquehanna River, which waters at the time of the said assessment were not the property of your petitioner and were not subject to taxation by the State of Maryland.

"(d) Because said Commission at said hearing refused to grant the rulings on legal points or prayers submitted by your petitioner at said hearing, as authorized by law, and numbered 3, 4, 5, 7, 8 and 9 (a copy of which said prayers and the rulings thereon is attached to this petition as part thereof and marked Exhibits B and C), and refused to followed the legal principles laid down in said prayers or requests and arrived at said valuation or assessment in disregard thereof."

That appeal was heard upon a transcript of the proceedings before the State Tax Commission, and upon the conclusion of the hearing, the order of the commission was affirmed. This appeal is from that order.

The appeal to the Circuit Court for Harford County did not challenge the propriety of the entire assessment made by the county commissioners, but involved only the item of 2,110 acres of land submerged by the water impounded by the dam, and this court on this appeal is limited to a consideration of that item alone.

The appeal raises three questions, which may be thus stated: (1) Is the property taxable at all by the State of Maryland? (2) if it is, was the assessment validly made? and (3) if not, can the mischief be remedied in this proceeding? These three questions will be considered in their order. (1) The appellant, hereinafter referred to as the Power Company, contends that the property is exempt from taxation by the State (a) because it is a federal agency, (b) because it is covered by an exemption granted to the proprietors of the Susquehanna Canal by Chapter 66 of the Acts of 1874, and (c) because the Power Company has no "absolute title" to the submerged lands, that it acquired from the state by chapter 268 of the Acts of 1908 the right to erect its dam and lay its pool upon the bed of the river, "a de-

clared public highway," that therefore the assessment was not upon the submerged land but upon the flowing water of the river, which cannot be validly assessed for the purpose of taxation.

1. The claim that the property is exempt from taxation as a federal agency is based upon the fact that the Power Company was licensed by the Federal Power Commission to construct and operate its project on the Susquehanna River for a term of fifty years. That license was predicated upon the assumption that that part of the river upon which the project is located is a navigable stream, and subject to the jurisdiction of the commission. That it is a navigable stream within the definition of "Navigable Waters" found in the "Water Power 'Act," June 10th, 1920, ch. 285, sec. 3, *Barnes Federal Code Cum. Supp.*, 1919-1924, sec. 9531c, in view of appellants' concessions, may for the purposes of this case be assumed. Whether the Susquehanna River is in law or in fact navigable is a question not presented by this record and not considered by this court, and nothing in this opinion contained is to be construed as in any sense determining that question or determining the validity of any legislation relating thereto. But assuming for the purposes of this case that the project is subject to the Federal Water Power Act, it is also subject to the condition stated in section 14 of that act, *Barnes Code, Cum. Supp.* 1919-1924, sec. 9531n, that upon or after the expiration of the license the United States shall have power to take it over upon the payment of just compensation as defined in that section. Both by the licensing agreement and the Water Power Act the Federal Power Commission is given extensive and important regulatory and supervisory powers over the construction, maintenance, operation, financing, rates, and service of the project coterminous with the license, and the licensee agreed except as otherwise authorized that it would "retain the possession of all project property covered by this license as issued or as hereafter amended, including the project area, the project works, and all franchises, easements, water rights, and rights of occupancy and use; and that none

of such properties valuable and serviceable to the project and to the development, transmission, and distribution of power therefrom will be voluntarily sold, transferred, abandoned, or otherwise disposed of without the approval of the commission; Provided, That a mortgage or trust deed or judicial sales made thereunder, or tax sales, shall not be deemed voluntary transfers within the meaning of this article."

It is also undisputed that the Power Company is a Maryland corporation, engaged in a public service, maintained and operated for private gain, and the immediate question is whether such a corporation, under the conditions stated, is such an agency of the federal government as to place its property beyond the taxing power of the state in which its property is located.

Although the phrase of the Maryland Bill of Rights, stating the just and salutary principle that "every person in the State, or person holding property therein, ought to contribute his proportion of public taxes for the support of the government, according to his actual worth in real or personal property," was omitted from the article as amended by chapter 390 of the Acts of 1914, ratified November 2nd, 1915, yet it is implicit in the following language of the article as amended: "And all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the counties and by the City of Baltimore for their respective purposes, shall be uniform as to land within the taxing district, and uniform within the class or sub-class of improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy." And while it is axiomatic that no tax may be imposed by a state upon property of the federal government, or upon agencies of that government when the effect of the tax would be to impair the efficiency of such agencies "in performing the functions by which they serve" it (*Cooley on the Law of Taxation* [4th Ed.], secs. 606, 607), that exemption does not exist in the absence of the reasons for the rule. So that the right of the Power Company to have its property in this state exempted from taxation by the state

depends upon two factors; one, whether it is a federal agency, the other whether, if it is, such a tax would impair its efficiency in discharging functions by which it serves the federal government. For as a person owning property in the state, it rests under the obligation common to all holding property therein, of contributing its proportionate share of the public taxes for the support of the government, unless such contribution would to some extent impair its capacity to perform duties and functions imposed upon it as a federal agency.

But, assuming that it is a federal agency, after careful consideration of the very forcible and able arguments offered in support of it, we are unable to find any substantial support for the Power Company's contention that it is such a federal agency as is necessarily exempt from state taxation, or that the payment to the State of just and reasonable taxes on its property will to any extent prevent it from discharging every duty and performing every function imposed upon it either by its agreement or by law with respect to the federal government.

The mere fact that the impounding of water by its dam may to some extent facilitate navigation for a short distance is incidental and secondary to its primary purpose of manufacturing and selling electric energy for profit, and it is not required to do any act or thing in aid of the federal government except that it is permitted or licensed to complete a project for its own profit which incidentally may affect beneficially or otherwise the navigability of the river. But it is contended that the United States has a "power coupled with an interest" in the project. Just what is meant by that expression or how it affects the question under consideration is not apparent. That the federal government has an interest in the project and that it may exercise certain powers in respect to its operation and maintenance in aid of navigation cannot well be denied. For "whenever" the United States desires to install navigation facilities, the licensee is required to grant to it such of its lands and rights of way, and permit such control of its pools, as may be required for that purpose, and as already stated the United States may, upon the ex-

piration of the term of the license, take over the project upon the payment of just compensation therefor. It has therefore in a sense an interest in the project, and certain optional powers in respect to its control and operation. But such powers and interest are nothing more than a consideration for the license, and do not in themselves constitute the licensee a federal agency. The interest is essentially reversionary, and the powers, except such as refer to service and rates, are for the most part contingent upon an event which may never occur, to wit, the installation of navigation facilities by the federal government. The principal and controlling facts are that the licensee desired to establish on the Susquehanna River a power project to make money for its stockholders, that to accomplish that purpose it required a federal license, and that the federal government, in consideration for that license, exacted of the licensee certain concessions which may be valuable or meaningless accordingly as they may be affected by conditions which cannot now be predicted. But even though the licensee is required to do every act required by the license, there is nothing in the nature or the extent of its obligations which can support the inference that the payment by it of its proportionate share of the public taxes will in any degree impair its capacity to render to the United States the full service stipulated as a consideration for the license.

That the numerous and extensive power projects located on navigable waters, licensed by the Federal Power Commission, in the aggregate representing vast capital expenditures, and earning for their proprietors liberal returns on their investment, should under the conditions stated be regarded as federal agencies and as such exempt from the burden of taxation common to all who receive the benefits and the protection of state governments it is imposed to support, would be a wholly unreasonable and arbitrary conclusion. And no such result appears to have been contemplated by Congress in the enactment of the Water Power Act, for not only does it throughout characterize persons authorized to construct power projects under its terms as "licensees," but it inferenti-

ally concedes that the property of a licensed project may be taxed, for in section 8, *Barnes Code Cum. Supp.* 1919-1924, sec. 9531h, in prohibiting the voluntary transfer of any license or rights thereunder granted, it exempts from the scope of the term "voluntary" tax sales. Nor, as we understand it, is it the policy, if it is within the power, of the federal government to embarrass and injure the states by depriving them of taxes which should be applied to the support of their governments, merely to increase the profits of money making projects which the states themselves have created. In our opinion therefore the power company is not such a federal agency as is by its very nature exempt from state taxation. Its capacity to perform such duties and functions in the service of the federal government as are imposed upon it, either by its own acts or by law, will not be impaired by the imposition upon it of its proportionate share of the public taxes of the State, and it is not exempt from taxation by the State. *Cooley on Taxation* (4th Ed.), sec. 607; *Thompson v. Union Pac. R. Co.,* 9 Wall. 591; *Union Pac. R. Co. v. Peniston,* 18 Wall. 5; 26 *R. C. L.* 105; *Baltimore Shipbuilding etc. Co. v. Baltimore,* 195 U. S. 375, 97 Md. 97.

1b. The Proprietors of the Susquehanna Canal was incorporated by chapter 23 of the Acts of 1783, for the purpose of constructing a canal not less than thirty feet wide and three feet deep between Love Island and tidewater in the Susquehanna River. Chapter 66 of the Acts of 1784 amended that charter, and among other things provided: "That the said canal, locks and other works, with their profits and advantages respectively, shall be and the same are hereby vested in the proprietors of the Susquehanna Canal, their heirs, successors and assigns, forever as tenants in common, according to their respective shares, and the same shall be deemed real estate, and shall not be subject or liable to pay any tax, imposition, duty or assessment, whatsoever; * * * that is to say, provided always, that such exemption from taxation shall extend to such works as relate merely to, and are necessary for, the navigation of said canal." Chapter 99 of the Acts of 1797 declared that "the bed of the river Sus-

quehanna, from the Maryland line to tide water, shall be considered a public highway, free for any person or persons whatever to work thereon in clearing the obstructions to its navigation; provided always, that nothing herein shall be taken or considered to permit any person or persons whatsoever to do any act repugnant to the power given by law to the said corporation over the waters of said river, so far as the same may be necessary for the purpose of supplying the said canal and the water-works thereon, or repugnant to the power given by law of excluding others from cutting any other canal or canals along the side, without the margin of the said river, to the injury of the said canal."

The canal company some time prior to 1817 found itself in financial difficulties and its property was sold, at the instance of the Bank of Baltimore, by the sheriff of Cecil County to Samuel Sterrett, acting for himself and others. There being some doubt as to the validity of that sale, the Legislature, by chapter 150 of the Acts of 1817, authorized a majority of the stockholders to sell the canal property and confirmed and transferred to such persons as might purchase it the privileges and immunities of the original company, and incorporated such prospective purchasers under the same name. Under that authority the directors of the company, by and with the consent of a majority of its stockholders, sold its property to Robert Oliver and others. The stock in the company constituted by these purchasers was subsequently acquired by the McCall's Ferry Power Company and by it assigned to the appellant. In 1894 the property of the canal company was sold under mortgage foreclosure at the suit of the State to Eben J. D. Cross, and through him by various mesne conveyances it too has become vested in the appellant. The canal property at one time contained about 280 acres of land along the river shore in Cecil County, but from time to time, in different parcels, 127 acres of that total were conveyed away.

The record fails to disclose when the canal was completed, how long it was operated, or indeed whether it was ever successfully operated. Its career was brief, gloomy and while

"some of the remains of it" were until the construction of appellant's dam still visible, the canal itself has long been abandoned, and a part of it, until the construction of the dam was commenced, used by the Columbia & Port Deposit Railroad Company for its railroad, and all of it is now submerged.

The expressed purpose and reason for the exemption declared in chapter 66 of the Acts of 1784 was to aid the operation and maintenance of the canal, and it was limited to "such works as relate merely to, and are necessary for, the navigation of the canal." The canal has long since disappeared, its value as a means of transportation has been destroyed by later systems, such as the railroad and the automobile truck, and the canal company has for many years existed for no other apparent purpose than to serve as a repository for certain property rights which might prove valuable for other uses. The contention that under such circumstances the original exemption still exists and inures to the benefit of such persons as may from time to time hold property under its franchise, without regard to the use to which such property is applied, verges on absurdity. But appellant's counsel met that obvious criticism by the ingenius suggestion that the Power Company has "canalized" the river. The record, however, shows that it has not "canalized" the river, but that, on the contrary, it has erected between tidewater and the upper reaches of the Susquehanna a barrier in the form of a dam about one hundred feet in height, nor does the fact that its dam forms a pool of back water some fourteen miles long, on which boats may float, make the river a canal. The company was not chartered primarily to operate a canal, but to manufacture and sell electric power, and while it is also designated in chapter 268 of the Acts of 1908 as a "slack water navigation" company and empowered to create "a safe and practical navigation up and down said river" either by backwater or by "means of a canal or canals along the margin thereof," there is nothing in the record which indicates even remotely that it has exercised or ever intends to exercise that power, but a more reasonable inference is that, if the river

ever is canalized, it will be by the federal government and not by the appellant. Under such circumstances it is needless to inquire into such questions as whether the appellant in fact acquired all the corporate immunities of the proprietors of the Susquehanna Canal, or the extent of those immunities, for under no circumstances could they extend to or affect property devoted to the uses to which appellant's property is now applied.

1c. The third ground on which the appellant claims that so much of its property as is involved in this appeal is exempt from taxation is not clear. In its brief it states that "the pool and declared public highway cannot be assessed separately as 'submerged lands.' " In its petition filed in the Circuit Court for Harford County it alleged that the assessment was illegal: "Because in so valuing and assessing submerged land owned by your petitioner, which were at the time of the said assessment and are now a part of the bed of the Susquehanna River, the State Tax Commission of Maryland included in said assessment, to give it such value, the waters of the Susquehanna River, which waters at the time of the said assessment were not the property of your petitioner and were not subject to taxation by the State of Maryland." That is, its contention appears to be, not so much that the property is exempt, as that because of its nature it is not assessable. That contention rests upon two fallacies: one, that the submerged land cannot be treated as property separate and apart from the water which flows over it, the other that the land and water together constitute a "highway" and as such cannot be taxed.

Manifestly the land can be considered as a thing separate and distinct from the water over it, just as a bowl containing milk may be considered as separate and distinct from its contents, and both the bowl and the milk may be separately owned. That the bed of a navigable stream above tidewater may be the subject of private ownership was decided in this state as early as *Browne v. Kennedy*, 5 H. & J. 195. In that case, speaking to that point, Judge Chase for the court said: "I have no doubt the king by the charter to the proprietary,

granted all the rights he enjoyed within the limits of the charter, subject to such savings and exceptions as are contained therein, and that the proprietary had a right to grant the land, covered by a navigable river, without interfering with or affecting the public or common right of user for the purpose of navigation and fishing." And in a separate opinion in the same case Judge Buchanan added: "The subject has, *de communi jure,* an interest in a navigable stream, such as a right of fishing and of navigating, which cannot be abridged or restrained by any charter or grant of the soil or fishery since *magna charta* at least. But the property in the soil may be transferred by grant: *Hargrave's Law Tracts,* 17, 22, 36, 37; subject, however, to the *jus publicum,* which cannot be prejudiced by the *jus privatum* acquired under the grant." See also *Wilson v. Inloes,* 11 G. & J. 359.

The other point is that the land supports the water, that the water constitutes a highway, that therefore both the land and the water are integral parts of the highway, that a highway cannot be taxed, and that therefore the land cannot be taxed. But the fallacy of that reasoning is that, while the river is a highway, it is not the kind of a highway that requires its exclusive appropriation to public uses, and the submerged land may possess a potential utility which may not be affected by the use of the water flowing over it as a public highway. And that distinction is graphically illustrated by the facts of this case. The appellant used the submerged land to impound water to furnish power to turn the wheels of its generating units. But the use of the impounded water for navigation will not on the one hand lessen the power which it delivers for that use, nor will the fact that it delivers power affect its use for navigation. Both uses are complementary, neither is exclusive, both are valuable, one is essentially public in its nature, not the subject of private ownership, and therefore not taxable, while the other is an incident of the ownership of land submerged by the pent-up water, which land may be privately owned, and because of its utility for impounding water may be valuable and may be taxed. *City of Lowell v. County Commrs. of Middlesex,* 152 Mass.

372; *Farnham on Waters,* secs. 432, 433; *Cooley on Taxation,* secs. 568, 1065, 1152.

2. Assuming that its submerged lands are taxable, appellant further objects that the assessment of which it complains was not validly made. The basis of that objection is the contention that the commission, in valuing the property, was controlled by false and illegal rules and standards. The assessment was made in 1928, and the objection must be considered in the light of the law as it stood then, and not as amended by chapter 226 of the Acts of 1929.

The State Tax Commission was created by chapter 841 of the Acts of 1914, and by that statute was given "the final determination of assessments of all property in all the counties, cities, towns and villages of the State, to the end that all taxable property shall be placed upon the assessment books and equalized between persons, firms and corporations in all the counties, districts, cities, towns and villages of the State, so that all persons, firms and corporations shall be assessed alike for like kinds of property." Code, art. 81, sec. 249, par. 2. The same statute also provided that any taxpayer might demand a hearing before the county commissioners as to the assessment of any property "and no formal proceedings shall be required," and that after such hearing any taxpayer assessed might appeal to the State Tax Commission, and that from decisions of that commission there might be an appeal to court on "questions of law only." From this and other provisions of the law in force at the time appellant's land was assessed, it appears that, in all questions of fact involved in tax appeals, the decision of the State Tax Commission was final, and that in exercising its discretion it was not controlled by any statutory guides, rules, standards, or restrictions, except the broad general limitation that all persons should be assessed alike for like kinds of property. It was, however, subject to the limitation as to uniformity imposed by article 15, Maryland Declaration of Rights, and to the implied limitation that it would value the land to be assessed according to the "best judgment" of its members and "with honest purpose." *Cooley on Taxation,* sec. 1146. And it

may be further implied, from the provision allowing an appeal to court from its decisions on questions of law, that in valuing property it was bound to use legal standards and methods to ascertain its actual fair value.

In assessing appellant's property, therefore, the commission was bound to ascertain and declare its actual fair value and to assess it accordingly, but in approaching that problem it was confronted by certain difficulties inherent in the nature of the undertaking. First, there was the absence of any general market for property of that character, because the value of the submerged lands depended so largely upon the contingency that capital could be secured to install the expensive and extensive equipment necessary to develop their latent possibilities, that lands could not well be sold at their real value unless sold as a part of or as ancillary to an entire project, which included the structures and machinery needed to realize their highest utility. Again, because of the unique character of the project, there was no other property within the state which was like it, which could be used as a standard to measure its value.

Obviously the simplest and the most convenient method of valuing appellant's property would have been to value the project as an entire thing. But the commission was prevented from adopting that method both by the statutory law of the state, and by the fact that a part of the property used in connection with and as a part of the project lay in another state. It was therefore compelled to separate the project into its component parts and to value such parts separately. And while that method was more difficult and more inconvenient than valuing the project as a whole, it involved no injustice or unfairness to the taxpayer, because after all the value of the whole was but the sum of the values of its parts, considered as parts of the whole. Nor does appellant object that the commission valued its submerged lands as a separate item, but because, it contends, its valuation was excessive, and that it was excessive because it included elements which were not incidental to or a part of the land as land, and because in arriving at its conclusion the commission was affected by con-

siderations which properly had no relation to the value of the land, and excluded from its consideration facts and circumstances which should have had a vital and controlling influence on its action.

The appellant sought to present the theory involved in those objections by certain prayers or instructions presented to the commission at the hearing. Of these prayers, the commission granted four, the first, second, sixth, and tenth, and refused the others, the third, fourth, and fifth, which related to the immediate question, and the seventh, eighth, and ninth, which related to the exemption of the property from taxation.

By its granted instructions, the commission bound itself to assess appellant's property "at its fair assessable value" in the same manner as like property of individuals would be assessed at "no higher proportion of valuation than other real property" located in the same taxing district "is assessed at," and excluded from its consideration all real property or easements located outside of the state. In granting those instructions the commission recognized every limitation imposed upon it by the statutory law of the state, but it is contended that, in refusing appellant's third and fourth prayers, it nullified the granted prayers, and in effect announced that it would not be bound by the principles stated in the rejected propositions. Appellee says, as one answer to that proposition, that, as the commission was not bound to grant instructions at all, that its action in refusing a prayer presents no question of law and is not reviewable on appeal. If the commission had refused to consider the instructions at all, there might be some force in that position. But when it did actually consider them, and rejected some and granted others, it seems too clear for argument that it did either accept or reject the legal propositions presented by the prayers, and it must be assumed that its decision was influenced by the considerations which affected it in disposing of them, and that its action in respect to them presents a question of law which may be reviewed.

Appellant's third prayer, reduced to its lowest terms, states the proposition that the assessment of its submerged lands

could not properly be made by estimating the value of its entire property in Maryland, and deducting from that total all items other than the submerged lands, but that it should be made by a "separate valuation of the different items of real estate." The prayer as drawn is needlessly confusing and might properly have been refused upon that ground. But passing that objection, the legal proposition which it embodies is unsound, if it was intended to present the theory that each parcel of land in Maryland owned by the appellant, and used as a part of its project, must be valued without reference to its relation to other parcels of its land used for the same purpose. Much of the submerged land had no intrinsic value considered as separate and independent parcels, for it was not adapted to many of the uses to which land is ordinarily put. It could not be tilled or grazed, nor could it be utilized for residential or industrial purposes. But when all of these parcels were consolidated into a single unit, which could be utilized for the profitable production of power, they each acquired a definite actual value by reason of that relationship as parts of that unit. The contention that the land embraced in that valley or basin, integrated as it is in a single unit, which can be and is utilized to produce an enormously valuable water power, has no value aside from its quality as land, or that it should be considered as mere land without reference to its potential utility for the production of water power, ignores the actual tangible facts. The unit could unquestionably be sold, and while its highest potential utility could not be realized without the expenditure of capital, the very fact that investors were willing to risk vast sums of money in developing that utility demonstrated its value.

The real value of these lands lies in the fact that they form a natural basin through which a large river flows and within a few miles falls nearly one hundred feet, and that by the erection of a dam across the only outlet from that basin the waters of that river may be impounded so as to generate nearly six hundred thousand horse power. To say that its utility for that purpose adds nothing to the value of the land, or, what in effect is the same thing, to say that the value created

by that utility cannot be taxed because such a tax would be imposed upon flowing water, simply ignores the facts.

No one of the parcels into which the lands were formerly divided had any such utility, considered apart from the other parcels which together formed the valley, for unless all were used none could be used. But when they were all gathered into a single hand, the potential utility latent in them became available and apparent. And for that reason, when so held, the entire tract of land was properly assessed as a unit. And since the prayer under consideration required the commission to value separately the different items of real estate, it was properly refused. *Cooley on Taxation*, sec. 1146, 1152; *Slatersville Finishing Co. v. Greene*, 40 R. I. 410; *L. R. A.* 1917F, 588 *and note; Pingree v. County Commrs.*, 102 Mass. 79, 80; *Penobscot Chemical Fibre Co. v. Town of Bradley*, 99 Me. 263; *Saco Water Power Co. v. Buxton*, 98 Me. 295; *Cheshire v. County Commrs.*, 118 Mass. 389; *Brack v. Baltimore*, 125 Md. 382; *Northern Cent. Rwy. Co. v. Baltimore*, 132 Md. 497. It therefore becomes unnecessary to consider at length the other proposition involved in it, that the commission could not properly assess the submerged land by first valuing all appellant's Maryland property and deducting from that aggregate value all other items. That method was irregular (*Auburn v. Young Men's Christian Assn.*, 86 Me. 244), and upon the facts peculiar to those cases the principle of the proposition involved was adopted in *Consol. Gas Co. v. Baltimore*, 105 Md. 43, 60, 101 Md. 541, although we do not understand that the expression, used in the case in 105 Md., that "we have thus distinctly held that the Appeal Tax Court cannot lawfully assess the easement by estimating, by the unit rule or otherwise, the gross value of all the property and assets of every kind of the company, and then eliminating the other classes of property, and treating the residum as the assessed value of the easement, but this does not determine how the easement should be assessed," went beyond the facts of that case. But as the prayer was properly refused for other reasons, it cannot be assumed in the absence of any evidence on the point that the

commission adopted in this case that method of valuing appellant's lands.

The appellant's fourth prayer was rightly refused because it unreasonably and improperly restricted the members of the commission in the exercise of the discretion which the law gave them. In effect it stated that the valuation of the submerged lands made by Messrs. Gregory and Fuller, civil engineers of national standing, was "made by methods totally inappropriate for the determination according to law of the fair taxable value of the items so valued, and upon a legally erroneous basis and by legally improper conclusions; that therefore the assessment of all of said items, which was admittedly made in pursuance of such valuation thereof as so determined by said engineers, is erroneous, and should be vacated and set aside." There was no admission of any kind in the record that the assessment made by the commission was "in pursuance" of the valuation made by such engineers, but on the contrary it appears that the assessment so made was less than half the valuation placed upon it by Gregory, who alone testified as to the value of the land as a separate item. And there was no reason why the commission should not, in its endeavor to ascertain the value of the property, have received, for what they were worth, the opinions of capable and experienced engineers as to the value both of the entire project as well as of its component parts. For, as stated in *Cooley on Taxation,* sec. 1152: "In appraising a water-power for taxation, the assessor may consider all facts affecting the value—the original cost of the entire property, the quantity of land flowed, the magnitude of the power, the places where it may be used, the limitations upon its use, the income derived by way of rents, the expenses of maintaining it, or anything which might affect the judgment of a person desiring to purchase it." Nor can it be said as a matter of law that the assessment is erroneous. The company itself supplied no information as to what the land actually cost it, but the commission had before it a full itemized description of the entire project, its capacity and

earning power, the testimony of the engineers for the county commissioners and the company as to its value, the amounts for which the property had formerly been assessed, and some more or less meaningless testimony as to the value of farm land in the neighborhood. They were entitled to consider and weigh all of this information, and while they were not bound to accept all or any of it at its face value, they were required, in the light of it, as well as of all other pertinent facts known to them, to value the property according to their best judgment, and there is nothing in the record to show that they did anything less than that, or that their valuation was unjust or oppressive.

Appellant's fifth prayer states that neither its federal license nor its Maryland franchises may be taxed, and then adds "neither is any method of valuation or assessment proper which includes in or adds to the valuation of such real estate as may be properly the subject of such assessment, the value of such franchises or either of them, or the capitalization of any income derived from the exercise of such franchises." The commission, after conceding that neither the license nor the franchises could be taxed, refused that instruction in so far as it "may be held to assume that the property of the Power Company must be assessed at such value as it would have if there were no license or permission of the Federal or State governments to use and operate the same as a power plant, the prayer is refused." No objection to that ruling was specially pressed in this court and we have been able to discover none. Assuming that neither the license nor the franchises may be taxed, the value they gave to appellant's project by permitting it to operate is taxable. Manifestly, if the appellant were not permitted to operate its project, much of its property devoted to its purposes would have a mere junk value, and the fact that it can operate is what gives its property its greatest earning power and utility. And as its value largely depends upon those elements, the effect of the license and franchises cannot be

ignored, *Consol. Gas etc. Co. v. Baltimore,* 101 Md. 541, in valuing its property.

3. In view of what has already been said, the third point presented by the appeal, which is whether under the law in force in 1928 this court can review the action of the commission in refusing an instruction presented by a party at a tax hearing, need not be discussed further than to say that, if the commission consented to receive and consider instructions at all, then its rulings as to them were, so far as they involved questions of law, reviewable. Moreover, should it appear from any legitimate source that a valuation had been placed upon appellant's property in "a capricious or whimsical or unwarrantable way," the valuation would not be an assessment at all, and the act of the commission in making it could be reviewed as a matter of law. *Consol. Gas etc. Co. v. Baltimore,* 101 Md. 558.

But there is nothing in this case to permit the inference that the appellant was injured by the action of the commission in valuing its property. The appellant did not itself offer any definite or positive valuation of its submerged lands. The evidence as to that value was largely that of warring experts, who quoted figures endlessly in classifying various items of property as tangible or intangible, in order to increase or decrease the value of this or that item of the company's real or personal property; of local real estate experts as to the value of farm and forest lands in the neighborhood; testimony as to the cost of isolated parcels of the flooded area; as to the cost of the entire project, its capacity and earning power, and as to the physical characteristics and utility of the submerged lands. With such assistance as this evidence afforded, the commission was required to value appellant's submerged lands, and there is nothing in the record before us to enable us to say that its judgment was not fairly exercised, or that its conclusion was not correct. The order appealed from will therefore be affirmed.

*Order affirmed, with costs.*