*State Department of Assessments and Taxation v. Kevin Andrecs*
No. 50, September 2014 Term

**Taxation - Property Tax - Principle of Uniformity - Homestead Tax Credit.** Under the Maryland Constitution, property taxes are to be uniform – a principle that requires that taxes be based on actual value and assessed on an equivalent proportion of value within each class or sub-class of property. The homestead tax credit statute, a law intended to mitigate the impact of inflation on home values and therefore on the property taxes owed by homeowners, can be in tension with the uniformity principle as it can result, at least temporarily, in discrepancies in the taxation of similar properties. The statute must be interpreted, whenever possible, consistently with the constitutional mandate of uniformity.

**Taxation - Property Tax - Homestead Tax Credit - Calculation of Credit when Residence is Razed and Replaced.** Under Maryland Code, Tax-Property Article, §9-105(c)(5), a homeowner, who has qualified for the homestead tax credit and who razes the home and vacates the property for an extended period of time in order to build a new home on the property, may nevertheless retain an existing homestead tax credit. However, under that provision, as well as under the provision concerning computation of the credit (Tax-Property Article, §9-105(e)), the value of substantial improvements to the property are to be included in the new taxable assessment of the property. This interpretation is not only consistent with the literal language of the homestead tax credit statute and its legislative history, but is also more consistent with the constitutional principle of uniformity than an alternative construction proposed by the homeowner in this case.

Circuit Court for Anne Arundel County
Case No. 02C12170279
Argued: February 9, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 50

September Term, 2014

_____

STATE DEPARTMENT OF ASSESSMENTS
AND TAXATION

v.

KEVIN ANDRECS

_____

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by McDonald, J.

_____

Filed: August 21, 2015

*Harrell, J., now retired, participated in the
hearing and conference of the case while an active
member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, he also participated in the decision and
adoption of this opinion.

An overarching principle of real property taxation, enshrined in the Maryland Constitution, is that like properties of like value are to be taxed alike. This is known as the requirement that property taxes be "uniform."[1] For a long-time homeowner whose residence has increased dramatically in value due to inflation or market-related forces beyond the control of the homeowner, strict adherence to the uniformity principle may cause financial hardship. To mitigate that effect, the Legislature created the homestead tax credit nearly 40 years ago to provide temporary relief from increasing property taxes for homeowners who can satisfy certain conditions.

But what about increases in value that are unrelated to external market conditions and are instead the result of the homeowner's own actions in making substantial renovations to the property? In the original version of the statute, a substantially renovated home was taxed at its full enhanced value and the homeowner lost the credit. When concerns were raised about such situations, the Legislature modified the homestead tax credit statute in certain respects to provide that a homeowner would retain an existing credit, but that the full value of the renovations would be included for tax purposes. This case requires us to construe one of those provisions.

Respondent Kevin Andrecs had lived in his home for approximately 10 years and benefited from the application of the homestead tax credit with respect to increases in the value of his home during that period. During 2008 and 2009, he razed the existing home, moved off the property, and built a new home that increased the value of the property by

---

[1] Maryland Declaration of Rights, Article 15.

nearly $500,000. The tax assessor, although retaining Mr. Andrecs' existing credit, included the full value of the renovation in the value to be taxed – an interpretation that was affirmed by the Maryland Tax Court. Mr. Andrecs argues for an alternative construction of the homestead tax credit statute under which he could effectively escape tax on the renovations for many years into the future. This would result in Mr. Andrecs' property being taxed at a much lower rate than similarly-situated and similarly-valued properties – in conflict with the constitutional uniformity principle.

We hold that the interpretation endorsed by the Maryland Tax Court accords better with the statutory language and legislative intent and better respects the uniformity principle.

**I**

**Background**

This case requires us to construe a statute – the homestead tax credit statute. As in any exercise in statutory construction, the language of the statute must be considered in context.[2] This is especially important in the interpretation of statutes that do not have a lineage of prior judicial construction. We start with a constitutional principle governing all property taxes in the State. We then proceed to a brief primer on the statutes governing real property taxation in Maryland, with particular attention to the homestead tax credit statute and the key amendments to that statute pertinent to this case. We then turn to the particular facts of this case.

---

[2] *Building Materials Corp. v. Board of Education*, 428 Md. 572, 585, 53 A.3d 347 (2012).

### A. The Constitutional Mandate for Uniformity in Taxation of Real Property

Article 15 of the Maryland Declaration of Rights establishes a uniformity requirement with respect to the taxation of real and personal property.[3] It requires that property assessments and taxes be "uniform" within each class or sub-class of property as those classes are defined by the Legislature. This uniformity provision requires that all property taxes within a particular class or sub-class be assessed based on an equivalent proportion of the property's actual value. *State v. Cumberland & Penn. R.R. Co.*, 40 Md. 22, 49-51 (1874) ("the Legislature is required to cause all public taxation for the support of Government to be fair and equal in proportion to the value of the property assessed"). It is a violation of the uniformity requirement for the Legislature to tax property within the same class or sub-class at different proportions of market value. *See Sears, Roebuck v. State Tax Comm.*, 214 Md. 550, 136 A.2d 567 (1957).

These two principles of the uniformity requirement – (1) that property taxes be based on actual value and (2) that they be assessed based on an equivalent proportion of value within each class or sub-class of property – have been a part of Maryland constitutional law since the Declaration of Rights was adopted in 1776.[4] *See Susquehanna Power Co. v. State*

---

[3] The uniformity requirement does not apply to income taxes, excise taxes, or special benefit assessments. *See, e.g., Katzenberg v. Comptroller*, 263 Md. 189, 197, 282 A.2d 465 (1971) (income tax); *Weaver v. Prince George's County*, 281 Md. 349, 355-65, 379 A.2d 399 (1977) (excise tax); *Leonardo v. County Commissioners of St. Mary's County,* 214 Md. 287, 306-9, 134 A.2d 284, *cert. denied*, 239 U.S. 207 (1957) (special benefit assessments).

[4] As adopted in 1776, Article 15 (then Article 13) stated in part: "... but every other person in the State ought to contribute his proportion of public taxes for the support of

(continued...)

3

*Tax Comm'n*, 159 Md. 334, 343, 151 A. 29 (1930) (amendments of the language of Article 15 did not affect the principle that taxes should be uniformly assessed based on the actual value of real property).

This Court has recognized that "perfect uniformity in assessments [is] impossible" and suggested that temporary inequalities in assessments do not violate Article 15, so long as the inequalities are ultimately reconciled. *See Rogan v. Calvert County Comm'rs*, 194 Md. 299, 311, 71 A.2d 47 (1950). Referring to this Court's *Rogan* decision, the Attorney General has advised the Governor and General Assembly that a lack of uniformity in assessments among properties within the same class might not conflict with Article 15's uniformity requirement if the disparity is temporary and does not persist for more than five years. 72 *Opinions of the Attorney General* 350 (1987).

**B.     *The Uniformity Requirement and Real Property Taxes***

Unless otherwise exempted by statute, all property located in the State is subject to assessment and property tax and is taxable to the owner of the property. Maryland Code, Tax-Property Article ("TP"), §6-101(a)(1). Generally, to determine the amount of property tax due, the assessment of the property is multiplied by the applicable rate. TP §6-401.

---

[4] (...continued)
government according to his actual worth in real or personal property within the State[.]" For a history of Article 15, *see* H.H. Walker Lewis, *The Tax Articles of the Maryland Declaration of Rights*, 13 Md. L. Rev. 83, 94-103 (1953). The current wording of Article 15 derives from constitutional amendments in 1914 and 1960. Chapter 390, Laws of Maryland 1914 (ratified November 2, 1915); Chapter 64, Laws of Maryland 1960 (ratified November 8, 1960).

*Tax Rate*

Property is divided into classes and subclasses. Real property is one class of property and is divided into 11 subclasses. TP §8-101(b). Consistent with the uniformity requirement of Article 15, a single tax rate applies to a subclass. The State and each county (including Baltimore City) set the property tax rates for property within their respective jurisdictions. *See* TP §§6-201, 6-202.

*Property Valuation*

Calculation of a property assessment begins with a determination of the property's value. Real property is valued separately for the land and improvements to the land. TP §8-104(a). The value of real property is determined by a physical inspection of the property by the State Department of Assessments and Taxation ("SDAT") once every three years. TP §8-104(b). The "date of finality" – when assessments become final for the next tax year – is January 1 of the year immediately before the first tax year to which the new valuation applies. TP §§1-101(i), 8-104(b)(2).

In any year of a three-year cycle, however, real property must be revalued if, among other things, "substantially completed improvements are made which add at least $100,000 in value to the property."[5] TP §8-104(c)(1)(iii). Another event that can trigger a mid-cycle revaluation of property is "a change in use or character" of the property. TP §8-104(c)(1)(ii).

---

[5] The new valuation takes effect on "the date of finality, semiannual date of finality, or quarterly date of finality following the substantial completion of the improvements to land." TP §8-104(c)(4).

*Phase-in of the Valuation*

The assessment of real property is the value to which the property tax rate may be applied. TP §1-101(b). Except for a few exceptions not relevant here, the assessment of real property is its "phased-in value." TP §8-103(c)(1).

Instead of immediately taxing the property at its full value calculated during each physical inspection, the increase in value between one physical inspection and the next is phased in over three years. TP §8-103(c)(1). Thus, the phased-in value for the first year increases by one-third of the amount by which the value increased over that yielded by the prior physical inspection of the real property; the assessment for the second year increases by two-thirds of the amount by which the value increased over the prior physical inspection; and the assessment for the third year includes the full amount by which the value increased over the prior physical inspection. TP §8-103(a)(3). If the physical inspection did not reveal an increase in value, the assessment for all three years is the value determined in the most recent valuation. *Id.*

*Tax Computation*

In sum, once the real property is inspected and valued, the increase in value from the most recent inspection is phased-in over three years. For each tax year, the amount of tax due is calculated by multiplying the phased-in value for that year by the tax rate applicable to the particular subclass of real property. The next step is to determine whether any tax credits apply.

## C.      The Homestead Tax Credit

During the 1970s, the country experienced significant inflation generally, and in real property values in particular. This resulted in substantial increases in the market value of real property and corresponding increases in real property taxes. A number of proposals were considered by the General Assembly to provide tax relief to homeowners from the effect of inflation on residential property values and tax assessments. *See* 62 *Opinions of the Attorney General* 54 (1977) (analyzing various proposals for residential property tax reform). Ultimately, the Legislature enacted a provision now known as the homestead tax credit. Chapter 959, Laws of Maryland 1977, *now codified, as extended and amended, in* TP §9-105.

Under the homestead tax credit statute, even though a residential property increases in value, the value used for purposes of computing property taxes is effectively capped at a certain percentage increase for each year, with the result that the homeowner owes less in real property taxes with respect to the home than if the cap did not apply.

*Conditions for Application of the Credit*

Pertinent to this case, in order to qualify for the tax credit, an owner of real property must satisfy certain requirements. First, the taxpayer must be an individual who has a legal interest in a dwelling. TP §9-105(a)(7).[6] Second, the house must be used as the principal residence of the homeowner. TR §9-105(a)(5)(i)1.A. Third, the house must be actually

_____

[6] Not pertinent to this case, the statute also defines "homeowner" to include "an active member of an agricultural ownership entity that has a legal interest in a dwelling." TP §9-105(a)(7).

7

occupied or expected to be actually occupied by the homeowner for more than 6 months of

a 12-month period beginning with the date of finality for the taxable year for which the

homestead tax credit is sought.  TP §9-105(a)(5)(i)1.B.

*Calculation of the Credit*

The statute provides for the computation of the credit as follows:

> For each taxable year, the homestead property tax credit is calculated by:
>
> (i)    multiplying the prior year's taxable assessment by the homestead credit percentage as provided under paragraph (2) of this subsection;
>
> (ii)   subtracting that amount from the current year's assessment; and
>
> (iii)  if the difference is a positive number, multiplying the difference by the applicable property tax rate for the current year.

TP §9-105(e)(1).  This formula includes two terms – "taxable assessment" and "homestead

credit percentage" – defined elsewhere in the statute.

"Taxable assessment" is defined as:

> the assessment on which the property tax rate was imposed in the preceding taxable year, adjusted by the phased-in assessment increase resulting from a revaluation under §8-104(c)(1)(iii) of this article, less the amount of any assessment on which a property tax credit under this section is authorized.

TP §9-105(a)(9).  We discuss the significance of this definition in greater detail below.[7]

---

[7] As shall become evident, it is important to distinguish the concept of "taxable assessment" as defined in TP §9-105(a)(9) from the concept of "assessment."  *See* TP §1-
(continued...)

The "homestead credit percentage" essentially sets a cap on the increase in the taxable assessment of a principal residence for any one year. State law sets that percentage at 110% of the prior year's taxable assessment for purposes of the State property tax. TP §9-105(e)(2)(i). Each county and municipal corporation is also authorized to establish its own percentage, between 100% or 110%. TP §9-105(e)(2), (5). In practice, this means that ordinarily the taxable assessment of the property will not increase more than 10% from the previous year, as long as the homeowner remains eligible for the homestead tax credit. Pertinent to this case, Anne Arundel County has established a homestead credit percentage of 102% of the prior year's taxable assessment for purposes of the County property tax.

*Credits of Long Duration Conflict with the Uniformity Principle*

When the homestead tax credit statute was first enacted in 1977, the Attorney General reviewed it for consistency with the State and federal constitutions, as with all bills passed by the Legislature. The Attorney General found the bill to be constitutional but noted "certain constitutional concerns," in light of the uniformity requirement of Article 15 of the Maryland Declaration of Rights and this Court's decision in *Rogan*. 62 *Opinions of the Attorney General* 859 (1977). In particular, the Attorney General explained that "any statutory scheme to place a percentage limitation on assessment increases over a long duration would become unconstitutional as applied." *Id.*

---

[7] (...continued)
101(c)(1) ("**Assessment**" means ... for real property, the phased-in full cash value or use value to which the property tax rate may be applied").

9

The Attorney General noted that, if a tax credit continued indefinitely, it would become unconstitutional as applied because a person whose property increased substantially in value would be taxed at a lower percentage of actual market value compared to a similar person whose property remained the same or increased insignificantly in value. 62 *Opinions of the Attorney General* 859 (1977); *see also* 62 *Opinions of the Attorney General* 54 (1977). This would violate the uniformity requirement of Article 15. The Attorney General concluded, however, that since the homestead tax credit was intended to provide temporary relief to homeowners facing financial hardship from increasing property values and, as initially enacted, was expressly intended to be limited in duration, it might not be unconstitutional. 62 *Opinions of the Attorney General* 859 (1977). In the same opinion, in interpreting an ambiguous provision within the tax credit statute, the Attorney General opted for the interpretation that was more consistent with the constitutional uniformity requirement. *Id*. at 862-63 & n.4.[8]

---

[8] The Legislature continued to renew the homestead tax credit each year and, for the first five years, the Attorney General continued to conclude that the provision was constitutional, despite its lack of uniformity in assessment, based on the temporary nature of the credit. *See* 72 *Opinions of the Attorney General* 350 (1987). However, after the homestead tax credit was extended for a sixth year (it was eventually made permanent), the Attorney General warned of the provision's "increasingly doubtful constitutionality," eventually concluding that the tax credit violated Article 15's uniformity requirement because it produces a lack of uniformity that favors persons with valuable properties. *Id.* These opinions and bill review letters, which all reached the same conclusion, were issued by three successive Attorneys General. This Court has never been asked to consider the merits of this analysis of the statute and we do not address the constitutionality of the statute itself in this opinion.

10

***D.***     ***The Problem of Substantial Renovations and Retaining Eligibility for Credit***

*1991 Amendment - Retaining Eligibility while including Value of Renovations*

Prior to 1991, a homeowner would lose eligibility for the homestead tax credit if, during the previous calendar year, the dwelling was improved substantially**.** TP §9-105(d)(1) (1986 Vol., 1990 Supp.). This resulted in an increase in the taxable assessment of the house to its full market value and a concomitant increase in a homeowner's property taxes, not only for the year in which the homeowner failed to qualify for the credit, but also for subsequent years, even if the homeowner re-entered the homestead tax credit program.[9]

In 1991, the General Assembly amended the homestead tax credit statute to allow a homeowner who made a substantial renovation to retain an existing credit, although the value of the renovations would still be added to the taxable assessment. Chapter 246, Laws of Maryland 1991.[10] Before the amendment, "taxable assessment" was defined as the difference

---

[9] If a homeowner failed to qualify for the homestead tax credit because substantial improvements were made to the home, the property taxes for that year would be calculated based on an assessment equivalent to the full phased-in value, as no credit would be available. Additionally, the substantial improvements would trigger a revaluation under TP §8-104(c)(1)(iii), meaning that the phased-in value would include the value of those improvements. The next year, if the homeowner otherwise qualified for the homestead tax credit, the credit would be calculated using the prior year's taxable assessment, which would now be the phased-in value from the previous year that included the value of the substantial improvements. From that year forward, increases would be capped at 10% (for State purposes) once again, but the "base value" - the taxable assessment used to calculate the homestead tax credit in the first year of eligibility - would be higher because it would include the value of the substantial improvements.

[10] The 1991 bill was proposed by SDAT, which also testified in favor of the bill, explaining this dual purpose. *See* Testimony of SDAT before Budget and Taxation Committee concerning House Bill 1098 (March 28, 1991) ("instead of disqualifying
(continued...)

11

between the assessment to which property tax rate was applied the previous year and the amount of the assessment on which the tax credit was authorized. TP §9-105(a)(5) (1986 Vol. & 1990 Supp.). The 1991 legislation amended that definition to include the increase in assessment resulting from a revaluation. This meant that, while a homeowner who made extensive renovations would no longer lose eligibility for the credit, the value of the renovations would be included in the computation of the "taxable assessment" for the prior year, which meant that the value of the improvements would become subject to the property tax. This part of the bill was adopted by the General Assembly as proposed and has remained unchanged to the present.[11] As indicated in Part I.C of this opinion, this definition is now codified in TP §9-105(a)(9).

*2006 Amendment - Retaining Eligibility while including Value of Rebuilt Home*

The Legislature extended the homestead credit statute in a similar fashion in 2006, to cover circumstances when a homeowner razed the homeowner's current principal residence and vacated the property for an extended period of time in order to rebuild the home.

---

[10] (...continued)
homeowners from receiving the homestead credit when they make extensive improvements, their assessment on which the homestead cap is based would be adjusted up by the value increase attributable to the improvements").

[11] In the 1991 amendments, the Legislature also clarified what constituted a substantial improvement triggering a mid-cycle revaluation of the property. It amended TP §8-104(c)(1)(iii) to trigger a revaluation only if the improvements exceeded $50,000 in value. Chapter 246, Laws of Maryland 1991. A subsequent amendment increased that threshold to the current $100,000. Chapter 274, Laws of Maryland 2009.

Under the law as it then existed, the razing of an existing home would be considered a change in use of the property – *i.e.,* it was no longer a principal residence. The change in use of the property would require a revaluation under TP §8-104(c)(1)(ii). The revaluation might well result in a lower valuation of the property in the short term, particularly because the existing home was razed. However, because the property was no longer the "principal residence" of the homeowner, and because a homeowner must live in the property at least six months during a calendar year to qualify for the homestead tax credit, the owner lost eligibility for the homestead tax credit. *See* TP §9-105(a)(5)(i)1. Once the new structure was built, the property would be revalued at a presumably higher value and the homeowner would no longer have the benefit of the tax credit that the homeowner had previously enjoyed. This resulted in dramatic increases in property tax liability for some homeowners in those circumstances.

The General Assembly responded by allowing a homeowner in such a situation to retain the tax credit if the homeowner met certain conditions. Chapter 169, Laws of Maryland 2006, *enacting* TP §9-105(c)(5). In particular, if the homeowner had used the property as the homeowner's principal residence for the three years before razing the home, the homeowner would remain eligible for the credit for the year in which the dwelling was razed and a subsequent year. Once the new improvements were completed and the property was revalued, the calculation of the credit would include the revaluation based on the substantial improvements. In other words, "while the full benefit of the credit ... may not be reduced, the calculation of the credit associated with the first taxable assessment after the

13

new improvements are added must include the revaluation, as provided under current law."[12]

Floor Report of House Ways and Means Committee for House Bill 275 at p. 1 (2006); *see also* Revised Fiscal and Policy Note for House Bill 275 (May 4, 2006) at p.1.[13] The proponents of that legislation testified that the legislation was *not* designed to avoid taxation of the improvements, but simply to retain the homestead tax credit that would otherwise be lost because the homeowner had temporarily moved off the property.[14]

*TP §9-105(c)(5)*

As a result of the 2006 amendments, the statute now includes a provision specifically directed to the application and computation of the credit when a homeowner razes and

---

[12] The reference to "current law" was apparently to the definition of "taxable assessment" in TP §9-105(a)(9) which, as noted above, had been amended in 1991 to require a taxable assessment to be increased to include the value of extensive renovations when calculating the credit.

[13] As with the 1991 amendment, SDAT testified in support of the measure. The bill was apparently patterned on a 2004 amendment, also part of departmental legislation proposed by SDAT, that had permitted similar treatment for homeowners whose homes were severely damaged during Hurricane Isabel in 2003. *See* Chapter 43, Laws of Maryland 2004 *codified in* TP §9-105(c)(3), (i).

[14] At a Senate committee hearing on the legislation that ultimately became the 2006 amendment to TP §9-105, the Legislature was advised that the legislation was designed to preserve the homestead tax credit enjoyed by the homeowner prior to razing an old house, but not to prevent the value of the new construction from being reflected in the taxable assessment. As one of the proponents explained: "That's fair – I put up a more expensive house." Recording of testimony before Senate Budget and Taxation Committee on Senate Bill 277 (February 22, 2006) at 10:30. (Senate Bill 277 passed both houses of the Legislature, but was vetoed as duplicative when the Governor signed the identical House Bill 275).

rebuilds the homeowner's principal residence. That provision, pertinent to this case, reads

as follows:

> (5)  (i)   This paragraph applies only if the homeowner owned and occupied a dwelling on the subject property as the homeowner's principal residence for at least the 3 tax years immediately preceding the razing of the dwelling or the commencement of substantial improvements on the property.
>
> (ii)   If a homeowner otherwise eligible for a credit under this section does not actually reside in a dwelling on the subject property for the required period of time under subsection (a)(2) or (d)(2) of this section because the dwelling was razed by the homeowner for the purpose of replacing it with a new dwelling or was vacated by the homeowner for the purpose of making substantial improvements to the property, the homeowner may continue to qualify for a credit under this section for the tax year in which the razing of the substantial improvements were commenced and 1 succeeding tax year even if the dwelling has been removed from the assessment roll.
>
> (iii)   If a homeowner qualifies for a credit under this paragraph, the full benefit of the credit existing at the commencement of the tax year in which the razing or vacating of the dwelling occurred may not be diminished during that tax year except that neither the calculation of the abatement nor the assessment under this paragraph shall include an assessment less than zero.
>
> (iv)   If a homeowner qualifies for a credit under this paragraph, the calculation of the credit associated with the initial taxable assessment of the substantially completed new improvements, which is effective on or before the second July 1 after the razing or vacating of the dwelling, shall include the revaluation under §8-104(c)(1)(iii) of this article.

TP §9-105(c)(5).

15

*E.*      ***Renovation and Taxation of the Andrecs Property***

*Razing and Rebuilding the Home*

Mr. Andrecs and his wife purchased their home in August 1999 and lived in the home as their primary residence until August 2008. In 2008, they razed the existing house in order to build a new house on the lot. The Andrecs lived elsewhere from August 2008 until their new home was completed in December 2009. It is undisputed that the Andrecs lived in the home for at least three years prior to razing it, thus retaining eligibility for the homestead tax credit under TP §9-105(c)(5)(i)&(ii). It is also undisputed that the new construction increased the value of the property by more than $100,000 – thus triggering a mandatory revaluation under TP §8-104(c)(iii).

*Revaluation of the Property by SDAT*

It appears from the record that the prior structure was valued by SDAT at $126,290 and its phased-in value for July 1, 2010 was $117,476. After the original house was razed, SDAT reduced the value of the improvements on the property to a nominal $100. During this time, in accordance with TP §9-105(c)(5), Mr. Andrecs was able to retain the homestead tax credit even though the property was not used as a principal residence for 17 months.[15]

---

[15] As explained in Part I.D of this opinion, in the absence of TP §9-105(c), Mr. Andrecs would have lost the credit because he did not live in a home on the property on July 1, 2009, and did not occupy it for six months of a 12-month period.

Pursuant to TP §9-105(c)(5)(ii),[16] SDAT calculated a homestead tax credit as if the house had not been vacated for the year and the 2009-2010 and 2010-2011 tax years. The phased-in assessment of the property for that 2010-2011 tax year was $835,476. The taxable assessments for that tax year were $647,704 (for purposes of the State tax) and $354,026 (for purposes of the County tax).[17] Mr. Andrecs received a total homestead tax credit of $4,447.06 and the resulting Fiscal Year 2011 tax levy was $4,115. Mr. Andrecs does not contest the calculation of the homestead tax credit and resulting tax levy for the 2010-2011 tax year.

After the new house was constructed on the property, SDAT conducted a revaluation of Mr. Andrecs' property in accordance with TP §8-104(c)(iii) in April 2011 for the 2011-2012 tax year.[18] It found that the market value of the land ($718,000) had not changed as a result of the new house but that the market value of the improvements on the property had increased from $100 to $504,100. Accordingly, it valued the property (including both land and improvements) at $1,222,100. While SDAT included Mr. Andrecs' existing homestead tax credit in its computation, it also included the increase in value attributable to the newly

---

[16] Under TP §9-105(c)(5)(ii), a homeowner who has razed and vacated his principal residence may continue to qualify for the credit for that year and a subsequent tax year.

[17] A new value based on the improvements is calculated only after the "second July 1 after the razing or vacating of the dwelling ..." TP §9-105(c)(5)(iv).

[18] Tax year 2011-2012 was the third year of the three-year cycle for Mr. Andrecs' property. TP §8-104(c)(1)(iii) requires a revaluation outside the normal three-year cycle when substantial improvements that added at least $100,000 in value to the property had been completed.

17

constructed home in calculating the 2011-2012 taxable assessments. This resulted in a taxable assessments of $1,137,761 (for purposes of the State property tax) and $755,463 (for purposes of the County property tax). Applying the State and County tax rates to the full value of the property for tax year 2011-2012 would yield a tax liability of $12,804.86.[19] Application of the existing credit – now totaling $4,340.86 – against that amount resulted in Fiscal Year 2012 tax levy of $8,464. The tax levy was considerably higher than the tax levy for the previous tax year due to the inclusion of the value of the new house.

*Mr. Andrecs Appeals the Assessment*

Mr. Andrecs contested SDAT's calculation of the 2011-2012 taxable assessments and homestead tax credit. Mr. Andrecs argued that the statute did not permit SDAT to include the value of the newly constructed home in its calculation of the initial taxable assessments used in the computations. Rather, according to Mr. Andrecs, the statute required that the taxable assessments for the 2011-2012 tax year be capped at 102% (for County purposes) and 110% (for State purposes) of the 2010-2011 taxable assessments and the revaluation would be used elsewhere in the computations in a way that increased the amount of the credit to $8,405.82. Mr. Andrecs outlined his argument and calculations in a written appeal to SDAT, which rejected that argument. Mr. Andrecs then appealed the decision to the Property Tax Assessment Appeals Board for Anne Arundel County (the "Appeals Board") which concluded that SDAT had correctly calculated the homestead tax credit.

---

[19] That figure also included a "solid waste service charge" in the amount of $315.

18

In a separate appeal by Mr. Andrecs concerning the valuation of the property with the new house, the Appeals Board reduced the assessment by $100,000 from $1,222,100 to $1,122,100 on the ground that the property was not compared to similar properties within its value range. SDAT has not appealed that determination and it is not at issue here.

*Tax Court*

Mr. Andrecs then appealed SDAT's calculations to the Maryland Tax Court. The Tax Court held a hearing on May 15, 2012, at which Mr. Andrecs and the Supervisor of Assessments for Anne Arundel County testified. In an oral ruling at the conclusion of the hearing, the Tax Court concluded that SDAT had correctly calculated the 2011-2012 taxable assessments and homestead tax credit. The Tax Court further concluded that Mr. Andrecs' interpretation of the homestead tax credit statute was contrary to the statute and to the legislative intent underlying the statute. The Tax Court issued a brief written order incorporating its conclusions. Attached to the order was a chart displaying figures used in the calculation of the credit derived from an exhibit submitted by SDAT.[20]

*Judicial Review*

Mr. Andrecs then filed in the Circuit Court for Anne Arundel County a petition for judicial review of SDAT's calculations. The Circuit Court reversed the decision of the Tax Court and concluded that SDAT should not have relied on TP §9-105(c)(5) when calculating

---

[20] The chart differed from the exhibit in that it incorporated the change in valuation of Mr. Andrecs' new house resulting from the decision of the Appeals Board in his valuation appeal.

19

the credit, and that it should not have included the value of the renovations in the calculation of the initial taxable assessment.

SDAT appealed the decision of the Circuit Court. The Court of Special Appeals affirmed the judgment of the Circuit Court in an unreported decision. This Court granted SDAT's petition for certiorari to determine whether the "taxable assessment" used to compute the homestead tax credit under TP §9-105 should include the value of renovations when a homeowner razes and rebuilds a home.

## II

## Discussion

### A.    *Standard of Review*

In this case, our task is to review the decision of the Tax Court – as opposed to the decisions of the courts that previously reviewed that decision. *Green v. Church of Jesus Christ of Latter-Day Saints*, 430 Md. 119, 132, 59 A.3d 1001 (2013) ("we look through the decision of the Circuit Court and evaluate directly the conclusions reached by the Tax Court"). The Maryland Tax Court is an independent administrative agency designated by the Legislature to hear certain appeals concerning certain tax issues under State law. Maryland Code, Tax-General Article, §3-101 *et seq*. The Tax Court's findings of fact are reviewed on a deferential "substantial evidence" standard. *Gore Enterprise Holdings, Inc. v. Comptroller*, 437 Md. 492, 504-5, 87 A.3d 1263 (2014). A reviewing court also accords great weight to the Tax Court's interpretation of the tax laws, but reviews its application of case law without special deference. *Id.*

20

**B.**     *Computation of the Homestead Tax Credit When a Homeowner Razes and Rebuilds*

The parties stake their positions on different parts of the homestead tax credit statute. Mr. Andrecs argues that TP §9-105(e) supports his argument that the Tax Court decision is wrong although he acknowledges that TP §9-105(c)(5) has some relevance. SDAT emphasizes paragraph (c)(5) as the primary provision that supports the Tax Court's decision to the exclusion of subsection (e). In fact, both of these provisions are pertinent to the resolution of this case. Without application of paragraph (c)(5), Mr. Andrecs would not be eligible to retain his homestead tax credit after razing his home and, as outlined above, that provision not only governs eligibility for the credit but also gives certain directions as to its computation. Subsection (e) remains applicable, though, as it provides the general directions for computation of the credit.

The Tax Court itself did not explicitly rely on either provision in its oral ruling. Noting that the statute "could have been clearer," the Tax Court observed that Mr. Andrecs' interpretation did not make sense "logically" because it would shield the value of new construction from taxation for a long period of time and that it was inconsistent with the legislative intent underlying the homestead tax credit.

Although the Tax Court did not provide an elaborate statutory analysis of the application of the homestead tax credit statute, its two points are correct. Its decision is also consistent with the application of both statutory provisions cited by the parties, as outlined below.

21

*Application of TP §9-105(c)(5)*

As explained in Part I.D of this opinion, a homeowner loses eligibility for the homestead tax credit if the homeowner ceases to use the property as the homeowner's principal residence. Thus, in the absence of TP §9-105(c)(5), Mr. Andrecs would not have retained the homestead tax credit for the 2011-2012 tax year that he enjoyed in prior years and would have owed substantially higher property taxes for that year because (1) he did not occupy the property as his principal residence during some of those years (TP §9-105(a)(5), (d)(2)) and (2) the value of the improvements to the property with the construction of the new house triggered a revaluation that would have been taxed at full value (TP §8-104(c)(1)(iii)).

Of the four subparagraphs of TP §9-105(c)(5), two create eligibility for the credit where it would not otherwise exist and two affect the computation of the credit for those homeowners who remain eligible. Under subparagraph (i), Mr. Andrecs was eligible to continue to receive the credit because he had lived in the property as his principal residence for the three years prior to razing it. Under subparagraph (ii), Mr. Andrecs qualified for the credit for two years that he would not otherwise have qualified, even though the original home had been razed and he was no longer living on the property.

But the provision that saved the tax credit for Mr. Andrecs also gives direction on the calculation of the credit in those circumstances. Subparagraph (iii) provides that the homeowner is to receive the full value of the credit during the years that the homeowner would otherwise be ineligible, but also precludes the computation from resulting in an assessment below zero that would generate a refund. Finally, subparagraph (iv) makes clear

that the calculation of the credit associated with the initial taxable assessment of the property with the new house must include the revaluation of the improvements under TP §8-104(c)(1)(iii).

In sum, a taxpayer who meets the eligibility criteria of subparagraphs (i) and (ii) is able to retain an existing credit, but subparagraphs (iii) and (iv) ensure that this dispensation does not result in a windfall that shields the taxpayer from taxation on the value of the improvements.

*Computation of the Homestead Tax Credit*

As noted above, the calculation of the homestead tax credit can be conceived of as a three-step process under TP §9-105(e)(1)(i) through (iii). Those three steps are explained below, using the relevant figures for the computation of Mr. Andrecs' homestead tax credit for the 2011-2012 tax year to illustrate the process. At various points, we reference TP §9-105(c)(5) to carry out those steps.

*Step One*

The first step is to "multiply the prior year's taxable assessment" by the applicable "homestead credit percentage." TP §9-105(e)(1)(i). As an initial matter, one must identify "the prior year's taxable assessment."

Mr. Andrecs argues that the "prior year's taxable assessment" is the taxable assessment calculated for the 2010-2011 tax year based on the value of his property prior to the new construction – $647,704 (for the State) and $354,026 (for the County). The statute, however, provides a definition for "taxable assessment" – TP §9-105(a)(9) – which Mr.

23

Andrecs ignores in his version of the calculation.[21]  Accordingly, we must reject his definition of "taxable assessment" in favor of the one provided by the Legislature.

Under the statute, "taxable assessment" means "the assessment on which the property tax rate was imposed in the preceding taxable year, adjusted by the phased-in assessment increase resulting from a revaluation under §8-104(c)(1)(iii) of this article, less the amount of any assessment on which a property tax credit under this section is authorized."  TP §9-105(a)(9).  Substituting this definition for the defined term ("taxable assessment") in the statutory provision for the first step of the calculation (TP §9-105(e)(l)(i)) yields the following instruction for Step One of the credit calculation:

---

[21] Mr. Andrecs' arguments for ignoring the statutory definition have no merit.  In his brief, Mr. Andrecs argues that this definition did not apply because the first word in the phrase is capitalized in the definition subsection of the statute (TP §9-105(a)) – "Taxable assessment" – while the phrase appears in lower case letters in the computation subsection (TP §9-105(e)).  Of course, the first letter of *all* of the terms and phrases defined in TP §9-105(a) are capitalized, and none are capitalized as they appear in the later substantive provisions of TP §9-105.  Capitalization of the first letter of a defined term is a convention followed throughout the Maryland Code.  If Mr. Andrecs' distinction had merit, all of the statutory definitions in TP §9-105 – not to mention the rest of the Maryland Code – would be meaningless.

Mr. Andrecs also asserts in his brief that we are procedurally barred under Maryland Rule 8-131 from referencing the statutory definition because it was not specifically cited in the Tax Court.  Taken to its logical conclusion, this argument would entail an artificial approach to statutory construction that would defeat our oft-avowed purpose to "ascertain and effectuate the intent of the Legislature."  *See, e.g., Woznicki v. GEICO*, 443 Md. 93, 108, 115 A.3d 152 (2015) (citations omitted).

(i) multiplying the prior year's **[**assessment on which the property tax rate was imposed in the preceding taxable year, adjusted by the phased-in assessment increase resulting from a revaluation under §8-104(c)(1)(iii) of this article, less the amount of any assessment on which a property tax credit under this section is authorized**]** by the homestead credit percentage as provided under paragraph (2) of this subsection;

We parse through this statutory direction as follows:

For the 2011-2012 tax year, the prior year's (2010-2011 tax year) assessment for Mr. Andrecs' property was $835,476. *See* Part I.E of this opinion. The prior year's assessment must then be "adjusted by the phased-in assessment increase resulting from the revaluation under TP §8-104(c)(1)(iii)."[22] This also accords with the direction in TP §9-105(c)(5)(iv) to include the revaluation in the calculation of the credit associated with the initial taxable assessment of the property as improved. In the case of Mr. Andrecs' property, the revaluation under TP §8-104(c)(1)(iii) resulted in a new value of the property after the improvements of $1,122,100.[23]

The adjusted assessment is then reduced by "the amount of any assessment on which a property tax credit under this section is authorized." We look to TP §9-105(c)(5) for the

---

[22] Although Mr. Andrecs would prefer to abstain from using the statutory definition and the computations it requires, see footnote 21 above, in an alternate argument he offers his own interpretation of this calculation in an appendix to his brief. In his revaluation adjustment, he adds the value of the new building to the 2010-2011 *taxable assessment*. The error in his approach is that it confuses the term "assessment" – the term that appears in the definition and that refers to the value of the property – with the concept of "taxable assessment."

[23] In this exercise we use the value ultimately approved by the Appeals Board as a result of Mr. Andrecs' separate valuation appeal. *See* Part I.E of this opinion.

25

amount of the tax credit that is authorized in these circumstances and the corresponding amount of the assessment. Under TP §9-105(c)(5)(ii), a homeowner who razes a home principal residence to replace it with a new dwelling, and who otherwise meets the requirements of TP §9-105(c)(5), is entitled to the "full benefit of the credit existing at the commencement of the tax year in which the razing or vacating of the dwelling occurred." Mr. Andrecs had received the full benefit of the credit from the time he razed the original structure. For tax year 2010-2011, the amounts of the assessment on which the tax credit was based were $187,772 (for purposes of the State tax) and $481,450 (for purposes of the County tax). Those figures are separately subtracted from the adjusted assessment ($1,122,100) to derive the respective "taxable assessments." Thus, $187,772 is subtracted from the adjusted assessment figure – $1,122,100 – to arrive at $934,328 as the prior year's "taxable assessment" under the statutory definition for purposes of the computation of the State tax portion of the credit. Similarly, $481,450 is subtracted from $1,122,100 to arrive at $640,650 as the prior year's "taxable assessment" under the statutory definition for purposes of the computation of the County tax portion of the credit.

Finally, to complete Step One of the computation, these two figures for "taxable assessment" must be multiplied by the appropriate "homestead credit percentage." As indicated earlier, there is no dispute as to the appropriate percentages as they are set by law. With respect to the State tax, the State taxable assessment – $934,328 – is multiplied by 110%. This results in a total of $1,027,761. With respect to the County tax, the County

taxable assessment – $640,650 – is multiplied by the County rate of 102%. This results in a total of $653,463.

*Step Two*

In the second step of the calculation, the two figures resulting from the computations in Step One are each subtracted from the "current year's assessment." TP §9-105(e)(1)(ii). It is undisputed that the "current year's assessment" for Mr. Andrecs' property for 2011-2012 tax year was $1,122,100. For purposes of the State tax, that means that $1,027,761 is subtracted from $1,122,100, which yields $4,339. For purposes of the County tax, $653,463 is subtracted from $1,122,100, which results in $468,637.[24]

*Step Three*

The third and final step is to multiply the figures calculated in Step Two by the applicable property tax rates for the pertinent year. TP §9-105(e)(1)(iii). There is no dispute as to the respective property tax rates for the State and County for the 2011-2012 tax year.[25] Multiplication of the figures derived in Step Two by the appropriate rates results in a credit

---

[24] The parties have sometimes loosely referred to the figures derived in Step Two of the calculation as the "tax credits." In fact, they are not the credits, but rather represent what might be called the non-taxable portion of the assessment, derived as an intermediate step in the computation of the credit itself.

[25] The tax rates were .112 per $100 of taxable assessment with respect for the State tax and .910 per $100 of taxable assessment for the County tax.

of $105.65 with respect to the State tax and $4,264.60 with respect to the County tax, for a

total credit of $4,369.26 for tax year 2011-2012.[26]

While SDAT purported to be computing the credit under TP §9-105(c)(5) alone, the

calculations presented by SDAT and affirmed by the Tax Court mirror the above calculations

and are therefore consistent with the statute.

*Mr. Andrecs' Approach*

In the Tax Court and before us Mr. Andrecs has advanced an alternative approach to

computing the credit that would result in an increase in the credit he previously enjoyed by

an amount between approximately $3,000 and $4,000.[27]  Mr. Andrecs concedes that, under

TP §9-105(c)(5)(iv), the calculation of his homestead tax credit for 2011-12 tax year must

include the revaluation that captures the value of the new improvements.  He asserts that the

---

[26] The computations are:

> State: .00112 x $94,339 = $105.66
> County: .0091 x $468,637 = $4,264.60

These figures are slightly different from the figures for the credit that appear in the Fiscal Year 2012 tax levy that is in the record.  That tax levy and the computations that underlie the tax credit that appear in the tax levy were based on the original revaluation assessment of $1,222,100.  The chart that accompanies the Tax Court order, although it arrives at the same figures in Step Two, did not carry out the computation of the credit in Step Three which, in any event, is a matter of simple multiplication by undisputed tax rates.

[27] In the computation he presented to the Tax Court, his method would result in a credit of $8,405.82 for the 2011-2012 tax year.  In his brief, he computes the credit under his approach as $7,383.82.  The difference may be attributable to the fact that the parties were using the earlier valuation for the post-construction property in the Tax Court and are now using the valuation that resulted from the Appeals Board ruling in Mr. Andrecs' separate valuation appeal.

28

revaluation amount ($1,122,100) is included in his calculation because he would include it in Step Two (where the amount from Step One is subtracted from the current year's assessment – *i.e.*, the revaluation amount). However, this fails to carry out the statute, which directs that the calculation of the credit associated with the "initial taxable assessment" must include the revaluation. TP §9-105(c)(5)(iv). The term "taxable assessment" only comes into play in Step One. The figures used for the computation in Step Two do not include a "taxable assessment" but rather the new "assessment."[28] In any event, his approach ignores the adjustments required under Step One per the definition of "taxable assessment" in TP §9-105(a)(9).

*Summary*

The plain language of TP §9-105(e)(1), as supplemented by TP §9-105(c)(5) and as informed by the definition of "taxable assessment" in TP §9-105(a)(9), outlines the steps necessary to calculate the homestead tax credit when a homeowner has razed or vacated the home for more than 6 months in order to rebuild it. The figures approved by the Tax Court correlate to those made in accordance with the computation required by the statute.

Mr. Andrecs' approach would read the language of TP §9-105(e) without context or attention to the relevant definitions. Even if Mr. Andrecs' approach could somehow be made to fit the language of the statute, his expansive reading of the tax credit statute – which would not simply preserve his existing tax credit but almost double it – is contrary to the principle

---

[28] The two terms have different definitions. *See* definitions set out at p. 9 & n.7 above.

that tax exemptions and credits are strictly construed. *See SDAT v. Belcher*, 315 Md. 111, 118-19, 553 A.2d 691 (1989).

These conclusions are consistent with the legislative intent underlying the homestead tax credit statute and the constitutional uniformity principle that informs our construction of that statute. Consider a hypothetical example of a person who bought a vacant lot next door to Mr. Andrecs and built an identical house for his principal residence on that lot at the same time that Mr. Andrecs built his home. That homeowner would enjoy no homestead tax credit for the 2011-2012 tax year (Perhaps he might qualify for one in the future depending on the pace of inflation and external market forces, but he would receive no credit for simply building the house on a newly purchased lot). Using the figures in the record from Mr. Andrecs' tax levy, this hypothetical next door neighbor would have a property tax liability for fiscal year 2012 of $11,467.86[29] – the same situation that Mr. Andrecs would have had if he had razed and rebuilt his house before the 2006 amendment that enacted TP §9-105(c)(5). But, as a result of that legislation, Mr. Andrecs retained his prior tax credit (of more than $4,000) which lowered his tax liability to approximately $7,000.

---

[29] The computation of the tax would be as follows:

State:    .00112 x $1,122,100 = $1,256.75
County:   .0091 x $1,122,100 = $10,211.11

$1,256.75 + $10,211.11 = $11,467.86

This total does not include the $315 solid waste service charge that would presumably appear on the tax bills of both Mr. Andrecs and his hypothetical neighbor. See footnote 19 above.

In this case, Mr. Andrecs sought to enlarge his credit that would reduce his tax liability for that year even further to a little over $4,000 – nearly one-third of the tax that his otherwise identical neighbor would pay. His interpretation of the statute would preserve the discrepancy between him and his hypothetical neighbor indefinitely into the future as the increase in the taxable assessment of his property would be capped at 2% per year for the greater portion of the tax (the County portion), with the result that his improvements to the property would escape taxation for many years. This tax benefit would not shield Mr. Andrecs from an increase in property values beyond his control – which the homestead tax credit statute was designed to ameliorate – but from an increase in the value of the property completely within his control. The Tax Court rejected such an interpretation of the homestead tax credit statute. As outlined above, that decision is supported by the language of the statute, as well as its legislative history. Moreover, it is more consistent with the constitutional uniformity principle.[30]

[30] The question whether the homestead tax credit as a whole is consistent with the uniformity requirement of Article 15 is not before us and we do not address it. Nevertheless, in construing the portion of the statute that is at issue in this case we must construe it in a way that is consistent with the uniformity requirement and not contrary to it.

31

### III

### Conclusion

For the reasons stated above, we hold that, when a homeowner razes and rebuilds a home:

1.     The homeowner retains any existing homestead tax credit if the homeowner satisfies the criteria of TP §9-105(c)(5)(i) and (ii).

2.     The tax credit computation for the property with the rebuilt house is to be done in accordance with TP §9-105(c)(5) and TP §9-105(e)(1) with appropriate reference to the terms defined in TP §9-105(a).

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. THE CASE IS REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT AND TO REMAND THE CASE TO THE CIRCUIT COURT WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE TAX COURT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**